Argued January 5, reversed with instructions July 22, 1970

ANDERSON, *Appellant, v.*
KLIX CHEMICAL CO., *Respondent.*

472 P2d 806

*Gerald R. Pullen* and *Don G. Swink,* Portland, argued the cause for appellant. With Mr. Pullen on the briefs were Bailey, Swink & Haas, Portland.

*Wayne A. Williamson* and *Ridgway K. Foley, Jr.,* Portland, argued the cause for respondent. With them on the brief were Mautz, Souther, Spaulding, Kinsey & Williamson, Portland.

Before PERRY,[*] Chief Justice, and McALLISTER, SLOAN, O'CONNELL, DENECKE and HOLMAN, Justices.

DENECKE, J.

This is a products liability case. The plaintiff alleges that she suffered a skin disorder which was caused by her use of defendant-manufacturer's cleaning product while she was working as a hotel maid. The trial court set aside the jury's verdict for the plaintiff and entered a judgment for the defendant. Plaintiff appeals, assigning as error only the trial court's setting aside the verdict. The basic question is whether there was sufficient evidence to sustain the verdict.

The product, "Guard," is advertised for "PERFECT BATHROOM SANITATION." The defendant manufactured it, put it in quart and gallon plastic containers, labeled it and sold it through distributors. Plaintiff's employer asked a distributor for a product which would clean the grout between shower tiles. The distributor sold her a gallon container of Guard. The container was delivered with a plastic hand sprayer attached to the container by a three-foot plastic hose.

---

[*] Perry, C.J., retired June 1, 1970.

The plaintiff sprayed the tile and then washed it down with water and a rag. When she washed it down she felt a stinging sensation on her hands. She reported this to her employer and within five days went to a physician. She continued to go to a physician and was hospitalized on several occasions. There was testimony that she had been permanently injured because of this incident.

I

■ We have adopted § 402A of Restatement (Second) of Torts as the standard for strict liability in tort. *Heaton v. Ford Motor Co.*, 248 Or 467, 470, 435 P2d 806 (1967). Under that section, as well as under our cases, the product must be defective before there is liability. "The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Section 402A, *Comment g.*, at 351. In this case the plaintiff is not contending that the product was defective in the sense that it contained foreign ingredients or impure ingredients. Plaintiff's position is that the product is "in a defective condition unreasonably dangerous to the user" (§ 402A) because the defendant failed "to give adequate warning as to its use."

The Restatement supports plaintiff's theory. *Comment j.* to § 402A states: "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warnings, on the container, as to its use."

Courts have viewed this portion of the Restatement as basing liability upon a failure to warn.

"We think it is a fair summarization of the

foregoing comments to say that it is the opinion of the Law Institute that a product, although faultlessly made, may nevertheless be deemed 'defective' under the rule and subject the supplier thereof to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied and no warning is given." *Canifax v. Hercules Powder Co.*, 237 Cal App2d 44, 53, 46 Cal Rptr 552 (1965). Accord, *Crane v. Sears Roebuck & Co.*, 218 Cal App2d 855, 32 Cal Rptr 754, 757 (1963).

■ The defendant does not directly contradict plaintiff's contention as to the law but states: "Logically, failure to warn (effectively) conceptually resembles negligence, not strict liability." Conceptually defendant appears to be correct. This aspect of "strict liability," failure to warn of the dangers of an otherwise nondefective product, does revert to a negligence basis for liability. The basic questions are whether it was reasonably foreseeable to the manufacturer that the product would be unreasonably dangerous if distributed without a warning on the label and, if so, whether the manufacturer supplied the warning that a reasonably prudent manufacturer would have supplied.

Section 388 of Restatement of Torts and Restatement (Second), which is applicable to all suppliers of chattels, provides:

"One who supplies * * * a chattel for another to use is subject to liability * * * for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

"(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." 2 Restatement (Second), 300-301, Torts § 388.

This is not cross-referenced to § 402A; however, the connection seems apparent.

The authors of the leading article, *Product Liability: Directions for Use and the Duty to Warn*, 41 Va L Rev 145, 152 (1955), wrote: "The duty to warn against unusual hazards has long been recognized as a source of tort liability at common law."

We quoted with approval from *Bitts v. General Accident Fire & Life Assur. Corp.*, 282 F2d 542, 544 (9th Cir 1960): "Further, we note that, historically, failure to warn is one of the bases for holding a vendor or [of] products liable for negligence * * * and currently seems to occupy a place of considerable importance in the law of products liability." *Blohm v. Glens Falls Ins. Co.*, 231 Or 410, 419-420, 373 P2d 412 (1962).

The defendant was not harmed because the label of "strict liability" was placed on the plaintiff's cause. The pleadings alleged lack of adequate warning as the basis for liability, the court instructed that the defendant was liable if it did not give reasonable warning, and the defendant requested instructions basing the defendant's liability upon whether or not it gave reasonable warning.

The difficult aspect of this portion of the case is the question of whether the warning given was reasonable as a matter of law. The information was

printed upon the container itself or upon a label pasted on the container. The printed material stated:

## DIRECTIONS

TOILETS: On first cleaning use full strength and apply directly to stain with hand mop or brush. Stains under flushing rim will come off readily when cleaner is washed over stains with use of hand mop. Allow to soak a few minutes to make work easier.

TO REMOVE WATER LINE RING: Take 2 cups of water out of bowl and apply cleaner with steel wool pad. Rub gently so as not to scratch surface.

URINALS: Complete stoppage in waste lines leading from old urinals located under tile floors may often be opened and restored to normal use by simply pouring about 1 quart of cleaner into urinal. It will begin to seep through the standing water in the trap until it reaches the obstruction where it will begin to attack the scale in concentrated form, having displaced the water in that area. Use no force pumps or plungers, simply let stand overnight and check results in the morning. Dollars are often saved by eliminating the necessity of digging and replacing lavatory floors to locate and remove obstructions in urinal lines.

Excellent for sanitizing and reconditioning tiled showers and swimming pools.

DIRECTIONS: On first application pour cleaner in glass or plastic container and add equal amount of water. Dip mop or brush and

apply wherever needed. Allow solution to remain on surface about 5 minutes with no agitation. Brush lightly and rinse well with water.

DO NOT MIX WITH BLEACH—Do not use on Wash Basins or Bathtubs

## ACTIVE INGREDIENTS

| | |
|---|---|
| Hydrogen chloride | 9.5% |
| Non-ionic detergent | 3.2% |
| Essential oils | 1.2% |
| INERT INGREDIENTS | 86.1% |

## POISON

## FOR INDUSTRIAL USE ONLY

Keep away from children, domestic animals and foodstuffs.

## ANTIDOTES

EXTERNAL—Wipe off acid gently, immediately flood the surface with water, using soap freely, then cover with moistened baking soda.

INTERNAL—Drink a teaspoonful or more of magnesia, chalk, whiting or wall plaster, or small pieces of soap softened with water, in milk, mucilage or raw egg whites.

FOR EYES—Wash with copious flood of water.

— CALL A PHYSICIAN —

ONE U. S. GALLON

The defendant contends the label adequately warns because it states "POISON *FOR INDUSTRIAL USE ONLY*" and lists "Hydrogen chloride . . . . 9.5%" and the evidence is that plaintiff knew this was hydrochloric acid. Moreover, under "ANTIDOTES" the label states: "EXTERNAL—Wipe off acid gently, * * *," which defendant contends clearly indicates that the solution is harmful when in contact with the human body. The use of "acid" is a warning signal itself.

Plaintiff points out that if the directions were followed precisely, the user could reasonably believe that the solution would come into contact with hands and arms. The directions for cleaning tiled showers states to dip mop or brush in solution and apply. Plaintiff asserts that it is common knowledge that a liquid so applied is likely to drip upon one's hands and arms. Also, the directions for removing the water line in a toilet seem to contemplate dipping a steelwool pad held by the user into the solution and rubbing it on. This process plaintiff contends would normally cause the solution to come in contact with the hands.

What constitutes an adequate warning is stated in *Spruill v. Boyle-Midway, Incorporated*, 308 F2d 79, 85 (4th Cir 1962):

"* * * To be of such character the warning must embody two characteristics: first, it must be in such form that it could reasonably be expected to catch the attention of the reasonably prudent man in the circumstances of its use; secondly, the content of the warning must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person."

*Crane v. Sears Roebuck & Co.,* supra (218 Cal App2d at 860), approved the following instruction stating the nature of the warning that should be given:

" '* * * The warning should be such that if followed would make the product safe for users. To comply with this duty the manufacturer or supplier must appropriately label the product, giving due consideration to the likelihood of accident and the seriousness of consequences from failure to so label it as to warn of any dangers that are inherent in it and its use or that may arise from the improper handling or use of the product.' "

As observed, this question,—was the warning reasonable?—is the kind of question that is usually answered by a jury. *Spruill v. Boyle-Midway, Incorporated,* supra (308 F2d at 85-86); *Crane v. Sears Roebuck & Co.,* supra (218 Cal App2d at 860); 41 Va L Rev, supra, at 169. We conclude that the adequacy of the warning was a jury question in this case. There was sufficient evidence to support the jury's conclusion that the warning was not adequate.

## II

■ Another ground advanced for the defendant's motion for judgment n.o.v. was that the plaintiff misused the product. If a plaintiff's injury is caused by plaintiff's use of the product contrary to directions or warnings, recovery is barred. *Levin v. Walter Kidde & Company,* 251 Md 560, 248 A2d 151 (1968). Defendant's claim of misuse is based upon the plaintiff's failing to dilute the solution in the container to half-strength, applying the product with a sprayer instead of a mop or brush and wiping the tile with a rag and water rather than with a mop or brush.

We agree with the plaintiff's argument that the presence of the sprayer on the container would cer-

tainly permit a jury to find that the plaintiff acted reasonably in spraying Guard instead of applying it with a mop or brush. We also agree that the directions on the right side of the label to dilute do not necessarily warn that failure to dilute is dangerous. "It is clear from the better-reasoned cases that directions for use, which merely tell how to use the product, and which do not say anything about the danger of foreseeable misuse, do not necessarily satisfy the duty to warn." 1 Frumer and Friedman, Products Liability, § 8.05[1], 162-163 (1968).

In addition, the directions on the left side of the label state that to clean toilets, "use full strength," from which the user could reasonably infer that the directions on the right side of the label stating to dilute pertain to effectiveness in cleaning tiled showers and have nothing to do with personal safety.

■ We hold that the jury could find that the plaintiff did not use Guard contrary to the safety instructions on the container.

### III

The defendant contends it should not be liable as a matter of law because the container of Guard was substantially changed between the time the defendant sold it and its use by the plaintiff. The change was the attachment of the sprayer. The testimony indicates that the sprayer was added by the distributor.

Section 402A provides that seller is only liable if "(b) it [the product] is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." 2 Restatement (Second), supra, § 402A, 348.

There is a question whether the use of the

sprayer was a cause of plaintiff's condition; however, assuming that it was, we cannot conclude as a matter of law that the defendant could not reasonably anticipate that a sprayer would be attached to the Guard container and thus the customer would be invited to apply Guard by spraying.

■ The test in § 402A is foreseeability. See Dale and Hilton, *Use of the Product—When Is It Abnormal?*, 4 Will L J 350 (1967). Questions of this kind are generally answered by the jury unless the inferences are so clear that the court can state as a matter of law that no reasonable manufacturer could foresee such a change to the product. *Mazzi v. Greenlee Tool Co.*, 320 F2d 821 (2d Cir 1963), held that the question of whether the manufacturer should have foreseen the structural change made in the product by a third party was a jury question. In this case we hold that the question of whether the defendant as a reasonably prudent manufacturer of cleaning compounds could foresee that a distributor might attach a sprayer to the Guard container before selling it to a user was one of fact for the jury.

The defendant did not instruct its distributors not to affix sprayers. The aperture of the container is suitable for the attachment of a sprayer. The application of liquids by spraying is very popular,—paints, cleaning compounds generally, cosmetics, insecticides, and many other liquids are marketed with sprayer attachments.

■■ The jury had sufficient evidence to find that the addition of the sprayer by the distributor was foreseeable, hence, the change was not such that would excuse the manufacturer from liability.

## IV

The defendant urges that the use of Guard injured plaintiff only because plaintiff had a unique susceptibility to Guard. In *Cochran v. Brooke*, 243 Or 89, 409 P2d 904 (1966), we held in accordance with the accepted rule that a supplier of a product is not liable to an injured consumer if the injury occurred because the consumer had an uncommon sensitivity to the product.

Based upon the testimony of the dermatologist called by the plaintiff, the jury could have found the medical facts to be as follows: The plaintiff has dermatitis of the hands, arms and neck; dermatitis is an inflammation of the skin. She suffered contact dermatitis from contact with Guard. This contact dermatitis remained over a period of time during which time plaintiff developed autosensitization or a generalized sensitization of her skin. This condition brought about eczematous dermatitis over all her skin which has caused her various injuries such as thickening and darkening skin, loss of hair, etc. The plaintiff was not uniquely sensitive to the ingredients of Guard and the contact dermatitis was not caused by any unique sensitivity of plaintiff. The hydrochloric acid in Guard is a primary irritant and will cause contact dermatitis on almost anyone's skin if it comes in direct contact for any length of time.

The testimony on cross-examination of the course of plaintiff's condition from the initial contact dermatitis to her present condition is as follows:

A * * * From the intensity of the eruption that she had on her arms and neck and over a period of time, she developed a general sensitization that made her break out all over.

"Q All right. Now, is it fair, then, to say further, Doctor, that that is a susceptibility that is peculiar to her because of some unknown involvement of a genetic factor?

"A The exact mechanism that takes place we do not know, but we think it spreads, this type of thing spreads through the lymphatic system to produce the generalized dermatitis from the localized involved area, and it is not uncommon.

"Q All right. As I say, this is a condition which is peculiar to her, it is a particular susceptibility that is within her, is it not?

"A She was susceptible to have this happen, or it wouldn't have happened,—

"Q All right.

"A —but it isn't uncommon, it is a common thing that is seen quite often.

"* * *

"Q —I asked you if this allergic response in her is a particular peculiar susceptibility within herself that comes from some unknown genetic or metabolic factor. Isn't that true?

"* * *

"A She had to be susceptible to have this happen or it wouldn't have happened.

"Q All right. Now, why—

"A (Continuing) It is a mechanism that took place over a period of time from the original insult of this skin that produced her general sensitivity.

"Q And her general sensitivity is a result, is it not, of something uncommon or peculiar within her own physical makeup?

"A It would—

"Q Now, you can answer that 'Yes' or 'No,' Doctor, and after that you can explain any way you want to.

"* * *

"A I would say yes."

■ We interpret these facts and this testimony as supporting the jury's apparent finding that the initial injury to plaintiff, the contact dermatitis, was not brought about by any unique sensitiveness of plaintiff.

Although the consequences of this initial dermatitis were caused by a susceptibility that is not found in all persons, such susceptibility is not "uncommon."

The same medical process which the dermatologist described in this case occurred in *Land O'Lakes Creameries, Inc. v. Hungerholt*, 319 F2d 352, 357 (8th Cir 1963),—contact dermatitis caused by a primary irritant, ingredients in a fertilizer, a spread of the dermatitis with ultimate "atopic eczema" over large areas of the body. There was no discussion over the frequency of this susceptibility to a spread of the contact dermatitis. A jury verdict for plaintiff was sustained.

*Gerkin v. Brown & Sehler Co.*, 177 Mich 45, 143 NW 48 (1913), is still being quoted as authoritative upon this issue. In that case the plaintiff recovered a judgment against a jobber of fur coats for a skin condition allegedly caused by a dye used in coloring the collars. A medical witness testified that he could not say what proportion of people wearing dyed fur have trouble, "* * * but in my line of work we see cases occasionally. It is not very many, but still we see them; not more than half a dozen people are so affected with poisoning from furs come in to consult me during the course of a season * * *." 177 Mich at 59. Based upon this testimony the court observed:

"When the fact is once established and demonstrated by experience that a certain commodity, apparently harmless, contains concealed dangers, and when distributed to the public through the

channels of trade and used for the purposes for which it was made and sold, is sure to cause suffering to, and injure the health of, some innocent purchaser, even though the percentage of those injured be not large, a duty arises to and a responsibility rests upon the manufacturer and dealer with knowledge, to the extent, at least, of warning the ignorant consumer or user of the existence of the hidden danger. Failing to do so, the dealer, as well as the manufacturer, who has the knowledge and does not impart it, is liable to a subsequent, ignorant purchaser, reasonably within contemplation of the parties to the original sale, for injuries sustained through such hidden dangers. This is by reason of the duty the dealer owes to the public generally, which includes all whom it may concern, to give notice of any concealed dangers in the commodity in which he traffics, and to exercise a reasonable precaution for the protection of others commensurate with the peril involved. We think this principle applicable to the case at bar and fairly deducible from the many authorities touching manufacture and sale of dangerous commodities. * * *." 177 Mich 60.

In *Wright v. Carter Products*, 244 F2d 53 (2d Cir 1957), the plaintiff recovered a judgment against the manufacturer of an antiperspirant. The plaintiff introduced evidence that some individuals are "allergic" to aluminum sulfate, one of the ingredients in the product. The defendant introduced uncontradicted evidence that it had sold 82,000,000 jars of the product and only received 373 complaints of skin irritation. The court held it was a fact question whether the manufacturer had a duty to warn under these circumstances.

■ Based upon these decisions, which appear representative of the state of the law, we conclude that it is a question of fact in this case whether the defendant

should have foreseen that a sufficient number of persons were susceptible to aggravated dermatitis by reason of the hydrochloric acid in Guard and, therefore, the defendant had a duty to warn against the dangers from the use of the product.

## V

■ Defendant also urges that there is no expert medical evidence that the use of Guard caused plaintiff's condition. We read the transcript to the contrary. The principal medical witness called by plaintiff testified that plaintiff's contact dermatitis was caused by her skin coming into contact with Guard, which was a primary irritant, and her ensuing skin problems stemmed from this initial contact determatitis.

## VI

Defendant contends that the plaintiff was not entitled to recover because as a matter of law she was contributorily negligent or assumed the risk of using Guard. This defense is based upon evidence that about a year prior to this incident the plaintiff suffered from dermatitis of the hands and arms caused by use of another product called Di-Crobe. The plaintiff's treating dermatologist told her to wear rubber gloves in the future when she used disinfectants. Plaintiff did not use rubber gloves in this incident until she had cleaned one shower and had felt the tingling in her hands and arms.

■ The ingredients of Di-Crobe are not in evidence. The plaintiff would not necessarily know a product to clean tile showers would come within the class of products her physician described as disinfectants, if indeed it is a disinfectant. Under these circumstances, we decline to hold that the failure of the plaintiff to wear

rubber gloves before using Guard was contributory negligence or assumption of the risk as a matter of law.

Reversed with instructions to enter judgment upon the verdict.