Argued June 2, reversed September 18, 1975

## SCHMEISER, *Respondent, v.* TRUS JOIST CORPORATION ET AL, *Appellants.*

540 P2d 998

*Walter J. Cosgrave* of Cosgrave & Kester, Portland, argued the cause and filed briefs for appellant Trus Joist Corporation.

*Edward H. Warren,* Portland, argued the cause for appellant Construction Components, Inc. With him on the briefs were Donald E. Hershiser, and Hershiser, Mitchell & Warren, Portland.

*Raymond Conboy,* Portland, argued the cause for respondent. With him on the brief were Dan O'Leary, and Pozzi, Wilson & Atchison, Portland.

BRYSON, J.

Plaintiff brought this action on two counts, negligence and strict liability, to recover damages for injuries he sustained in a fall due to the collapse of long spanned truss joists used in the construction of a gymnasium at Lake Oswego High School No. 2.

Both counts of plaintiff's complaint contain identical allegations that defendants "failed to provide adequate instructions for the safe erection of the

joists" and "failed to warn of the dangers inherent in erecting the joists." Judgment was entered in favor of plaintiff on the jury's verdict and the defendants appeal.

The defendants assign as error the trial court's denial of their respective motions for a directed verdict. The question before us is whether there was sufficient evidence to submit the case to the jury upon the allegations in plaintiff's complaint. The validity of the trial court's denial of defendants' motions depends upon whether there was any substantial evidence that defendants failed to provide adequate instructions for safe erection of the joists and failed to warn of the inherent dangers in erecting the joists and, if so, whether there was substantial evidence that such failure caused plaintiff's injuries.

■ In considering this assignment of error, we view the evidence in a light most favorable to plaintiff. The plaintiff is entitled to every reasonable inference that may be drawn from both plaintiff's and defendants' evidence. *Krause v. Eugene Dodge, Inc.*, 265 Or 486, 490, 509 P2d 1199 (1973).

Defendant Trus Joist Corporation (Trus Joist) manufactured the truss joists and defendant Construction Components, Inc., (Components, Inc.) supplied and sold the joists to Juhr & Sons, Inc., the contractor and plaintiff's employer. The truss joists manufactured and furnished by defendants were used in constructing the roof of both the main gymnasium and the auxiliary gymnasium. The construction of the auxiliary gymnasium had been completed and the plaintiff was injured during the erection of the roof of the main gymnasium. The main gymnasium required trusses approximately 104 feet in length and were spliced together in the center. The trusses for the

auxiliary gymnasium were 80 feet in length and were manufactured in one piece.

The trusses used in the construction of the main gymnasium and which are the subject of this action are of the "H Series" (heavy). They consist of two 2″ x 6″ upper chords and two 2″ x 6″ lower chords which are held together by tubular steel webs. Interspaced along the bottom of the top chord and the top of the bottom chord are metal plates for the installation of a permanent bridging system[1] which provides the lateral support for the trusses. The permanent bridging runs at right angles to the trusses. Although the trusses are weak and unstable in their natural state, they develop exceptional strength when they are properly installed and placed in an upright position.

Both defendants supplied the contractor with printed instructions and illustrations for the installation of Series H trusses. Prior to erection of the joists, Components, Inc.'s representative visited the job site to discuss the correct procedure for the installation of the 104-foot trusses, and Components, Inc.'s assistant plant manager informed the contractor that "the joists were unstable 'til they were braced, and that he should install the bridging as he put the joists up." The contractor did not advise the defendants of their "problem" as cautioned in the instructions. Their first notice was after the joists collapsed.

Following are selected reproduced portions of the instructions and warnings given by defendants to the contractor, plaintiff's employee.

---

[1] The permanent bridging system consists of five continuous lengths of 2 x 4's which run perpendicular to and are attached to the metal clips on the bottom of the top chord and the top of the bottom chord of each truss. The bridging itself is secured to the walls of the building at both ends and is supported by metal cross bracing struts. (See portions of exhibits reproduced.)

# CAUTION:

Bridging and x Bracing should be installed as erection proceeds. No truss should be left without a connection to the bridging system.

START X-BRACES ONE SPACE OFF WALL

X-BRACE EVERY FOURTH BAY (MAX)

SEE BLOW-UP

Put a nail in all spaces provided.

3½"  O.C. SPCG.-3½"

Spacer bars at each line of bridging.

Anchor horizontal struts to a properly braced end-wall

or

install horizontal x bracing connected to top chord of 3 or more trusses and wall before continuing with erection.

HORIZONTAL X-BRACING

## NOTE

These are suggestions only. Erection bracing is the responsibility of the erector because building conditions and erection procedures may vary from job to job.

# DO NOT PLACE BUNKS OF BUILD-ING MATERIALS ON <u>TRUS JOISTS</u> EXCEPT AT END SUPPORTS

A TRUS JOIST system is designed to support specific loads. It is dangerous to overload a single joist or group of joists with piles of plywood, roofing or other materials. Distribute such materials in small bundles.

TRUS JOIST strength is in the upright position. They must be supported laterally to develop full strength. In a building this is provided by the sheathing and bridging.

<u>DO NOT</u> permit cutting or drilling of the wooden chords.

<u>DO NOT</u> remove steel pins or webs even temporarily.

<u>DO NOT</u> drive nails larger than 16d into a chord member.

<u>DO NOT</u> make field repairs to damaged TRUS JOISTS without approval from your supplier

---

### IF YOU HAVE PROBLEMS

Concerning damaged joists,
With fit,
Concerning modifications,
Or a question of any kind

### CALL YOUR TJ REPRESENTATIVE

In addition to the reproduced exhibits, Components, Inc., provided the contractor with a printed "General Information For Contractors," H Series:

"* * * * *.

"ERECTION: H Series Trus Joists are normally erected with power equipment. It is often advantageous to erect joists in pairs, installing bracing and even secondary roof framing or sheathing on the ground before hoisting.

"BRACING: It is extremely important that the bridging be installed as erection proceeds to insure stability. This is necessary for either top or bottom chord bearing joists. Do not attempt to install roof sheathing or sub-floor until all bridging is in place.

"* * * * *.

"CAUTION!

"A. Handle joists carefully at all times to prevent undue distortion, damage to chords or bending of webs.

"* * * * *.

"C. Do not place any material on top of Trus Joist until base angles are fastened down and all bracing installed. After joists are properly installed, distribute small piles of roof sheathing or other material widely to prevent excessive load concentrations.

"D. If you are not completely satisfied that the joists are being installed correctly call your supplier immediately.

"* * * * *"

together with additional illustrations showing proper erection of the trusses. The plans of the architect provided to the contractor incorporated other warnings and drawings furnished by defendants. They advised: "CAUTION: TJH * * * Trus Joists are unstable until attached to an adequate bridging system. Bridging and X-bracing should be installed as

erection proceeds. No truss should be left without a connection to the bridging system."

Plaintiff's brief acknowledges that "warnings need only be given to the contractor or installer, and that the manufacturer or seller is exonerated from liability for injury to workmen if the contractor has knowledge of the danger. Plaintiff does not challenge these general propositions, which in fact are foreshadowed in this jurisdiction by *McEwen v. Ortho Pharmaceutical Corp.*," 270 Or 375, 528 P2d 522 (1974), wherein we held that the manufacturer's duty of warning is satisfied if the physician but not the patient is given adequate warning. Both plaintiff and defendants refer to *Jacobson v. Colorado Fuel and Iron Corporation,* 409 F2d 1263 (9th Cir 1969) (duty to warn satisfied by giving warning to plaintiff's supervisor).

The record also conclusively shows that Dean May, project superintendent, and Robert Kauffman, job foreman for Juhr & Sons, and the work crew were fully aware of the characteristics of these instructions and understood the instructions and suggestions provided by defendants. Mr. Kauffman testified:

"Q. But you had seen the — a suggested method of doing it in literature that was provided by the supplier of the truss joists, hadn't you?

"A. Yes."

Mr. Dean May, the contractor's superintendent, testified that the printed instructions and suggestions for erection were given to him two or three weeks "before the erection began" and he had given these directions to those responsible for erection of the truss joists. He testified:

"Q. And do you know when you gave that direction to your people?

"A. Well, the people that were responsible for

erection, of course, had read the printed material several times. They nearly memorized it. * * *"

The erection of the truss joists for the roof began on a Friday and continued the following Monday and Tuesday. The trusses collapsed, injuring plaintiff, on Tuesday morning. At the time the trusses collapsed, the work crew had installed 14 trusses. The trusses were installed running east to west, beginning from the north wall, and were spaced 32", on center, apart. The work crew "tied" the trusses together by nailing 15 lines of temporary 2" x 6" and 2" x 8" struts to the top chord perpendicular to the trusses. The temporary struts across the top of the first (near north wall) trusses were anchored to the north wall and thereafter the top chord of each truss was anchored to the top chord adjoining it. The bottom chords of the trusses were not braced in any manner. Further, the trusses were welded down only at one end. Most important, the permanent bridging and bracing was not installed. Thus, the only lateral support of the 14 trusses was the temporary struts which were nailed perpendicularly across the top chords.

Thereafter, three bundles of 4' x 8' x 5/8" plywood were placed upon the temporarily braced trusses. Each bundle of plywood weighed approximately 1,100 to 1,296 pounds. The evidence indicates that two bundles of plywood were placed near the north wall and the third bundle of plywood was some 20 feet out from the north wall (not at "end supports"), across the seventh, eighth and ninth truss. In addition, 40 lineal feet of 4" cast iron drain pipe was placed across the trusses, together with the pipe or cross bracing between the bridging, which weighed approximately six pounds per foot. Mr. Rose', an engineer called by plaintiff, testified:

"A. * * * And after calculating this, I determined that those bundles of plywood would be ap-

proximately 42 per cent of the load ability of the joist as designed for live and dead loads."

Mr. Berkemeier, a civil instruction engineer called by the plaintiff, testified:

"A. * * * And it [the bundles of plywood] did increase the force in those temporary braces, oh, I'd say, by approximately 15 per cent, the weight of that plywood over and above the weight of the trusses, themselves.

"* * * * *.

"A. Well, it is an increase in the force that was in those struts by approximately that amount. Again, like I mentioned before, there [are] many factors that influence the strength of connections; one of them being the time duration. So the longer the load was on there, the more tendency there would be for the connections, if they were going to fail, to fail.

"Q. You made your computations, did you, presuming that there were three bundles of 20 sheets [plywood] each up there?

"A. Yes, three bundles of 20 sheets each."

Subsequently, on Monday, a serious misalignment or "snaking" was discovered in the trusses, and on Tuesday three men, including plaintiff, were sent aloft to "straighten up the trusses." The crane was used to lift one of the bundles of plywood from the trusses. Plaintiff assisted in this work and shortly thereafter the trusses collapsed.

Several expert witnesses were called to explain the reason for the collapse. Plaintiff's expert Birkemeier testified that

"A. * * * the collapse was caused by the lack of adequate top chord bracing * * *.

"* * * * *.

"* * * The weak link in the chain was when you put one truss up with the temporary braces,

you put a certain force in each one of these braces to hold that truss in line. You put the next truss up and strut it back to the first truss; you double the force in those initial struts that ran from the end wall out to the first truss. You put the third truss up; you triple that force. * * * When you get 14 trusses up, the force you put in those first 15 temporary braces that ran in the first truss to the wall is 14 times as great as it would be with one truss. * * * But the little nail connection with the period of time those trusses were up there, wasn't adequate. * * *

"So when we put these trusses up, the temporary bracing held for a few days, but the load factor started catching up on it until the connections failed. Actually, those little nail temporary brace connections, in my mind, failed, allowing those trusses to buckle, the top chord to buckle, and they collapsed. In my opinion, that is how the failure occurred."

Scargin, an architect, testified that the absence of proper cross bracing on the bottom chords caused the trusses to rotate and go out of alignment. Another expert, Rose', testified:

"Q.   If you had trusses just held by some cleats nailed up on the top and no internal bracing at all, and the trusses were out of alignment, then, Mr. Rose', suppose that in that condition, you exerted a pull on the truss to one side or the other; would that be important?

"A.   It would be critical.

"* * * * *.

"Q.   * * * You give a tug one way or the other, and down they come; right?

"A.   Perhaps, yeah."[2]

---

[2] Carlson, an engineer, testified that the removal or lifting of the plywood bundle by the crane "induced a lateral or horizontal load on the trusses."

Plaintiff did not plead that the Trus Joists were defective in design or manufacture and that issue is not before us. Plaintiff's brief acknowledges that "the instructions state: 'Bridging and X Bracing should be installed as erection proceeds. No truss should be left without a connection to the bridging system.'"

Defendants contend that (1) the instructions for the use of the trusses were adequate as a matter of law; (2) the warnings given by defendants were comprehensive to the average user as a matter of law; (3) the warnings against inherent danger and foreseeable misuse were adequate as a matter of law; (4) because proper construction procedures were actually known to plaintiff's employer, any inadequacy of the installation suggestion is not a factor in producing plaintiff's injuries.

Plaintiff contends that (1) the instructions were not specifically designed for the 104-foot truss joists; (2) the instructions do not state at what point the permanent bridging should commence; (3) the instructions do not tell the contractor how many lines of temporary bracing to use or which method of two which were suggested should have been used; (4) there was no instruction for the installation of plywood sheathing.

Due to plaintiff's identical allegations in both counts, the same rule applies in considering plaintiff's and defendants' contentions — was there any substantial evidence to support the allegations in both of plaintiff's counts. We have held that "a failure to warn may make a product unreasonably dangerous." *Fulbright v. Klamath Gas Co.*, 271 Or 449, 533 P2d 316 (1975); *Phillips v. Kimwood Machine Co.*, 269 Or 485, 525 P2d 1033 (1974).

■ We first determine if the instructions given to the contractor were adequate.

"* * * [A] warning must be fair and adequate, to the end that the user, by the exercise of reasonable care on his own part, shall have a fair and adequate notice of the possible consequences of use or even misuse. * * *

"* * * The rule is that when a manufacturer undertakes by printed instructions to advise of the proper method of using his chattel, he assumes the responsibility of giving accurate and adequate information with respect thereto, including instructions as to the dangers involved in improper use, * * *." 2 Hursh and Bailey, American Law of Products Liability 192, 193, § 8:19 (2d ed 1974). (Footnotes omitted.)

"* * * [W]here a proper warning is given, as by instructions on the product's container, the manufacturer or seller is normally not liable on the ground of negligence for product-caused injury where the warning or instructions are disregarded, and where it appears that the injury would not have occurred had they been observed. Similarly, there can be no breach of warranty recovery, and no recovery under the doctrine of strict liability in tort, where the gist of the action is an alleged failure to give adequate warning, but it 'is shown that a proper warning was actually given." *Id.* at 212-213, § 8:25. (Footnotes omitted.)

Generally, the burden of proof that defendants were negligent in failing to warn of a danger connected with the injury-causing product is on the plaintiff. *See generally* Annot., 53 ALR3d 239, 289, Products Liability-Failure to Warn. *See also* Noel, Products Defective Because of Inadequate Directions or Warnings, 23 Sw L J 256, 264 (1969).

In *Anderson v. Klix Chemical,* 256 Or 199, 209, 472 P2d 806 (1970), we held

"* * * that the directions on the right side of

the label to dilute do not necessarily warn that failure to dilute is dangerous. 'It is clear from the better-reasoned cases that directions for use, which merely tell how to use the product, and which do not say anything about the danger of foreseeable misuse, do not necessarily satisfy the duty to warn.' 1 Frumer and Friedman, Products Liability, § 8.05[1], 162-163 (1968)."

*See also* Dillard and Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va L Rev 145 (1955).

■ However, unlike the facts in *Anderson v. Klix Chemical, supra,* when a warning is actually given, as in the case at bar, the seller may reasonably assume that it will be read and heeded.

"* * * [A] product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." 2 Restatement of Torts (Second), § 402A, comment *j* (1965).

■ We do not believe that the plaintiff's contentions one through four, as previously set forth, are supported by the evidence: (1) It is argued that the instructions were not specifically designed for the 104-foot truss joists. Exhibit 1, the architect's drawings, specifically shows the permanent bridging and cross bracing and includes the afore-reproduced exhibits as prepared and given to the contractor, Juhr & Sons, by the defendants. This exhibit again states that "A Trus Joist system is designed to support specific loads. It is *dangerous* to overload a single joist or group of joists with piles of plywood, roofing or other materials. Distribute such materials in small bundles. * * * CAUTION: TJH * * * Trus Joists are unstable until attached to an adequate bridging system. Bridging and X-bracing should be installed as erection proceeds. No truss should be left without a

connection to the bridging system." (Emphasis supplied.) The architect's drawing specifically incorporates the instructions and warnings and the use of permanent bridging and cross bracing on the plans which the contractor was to follow;[9] (2) it is contended that the instructions do not state at what point the permanent bridging should commence. The instructions state, as above set forth, that bridging and cross bracing should be installed as erection proceeds. Again, the architect's plans call for five lines of cross bracing on the top and bottom of the lower and upper joists; (3) it is contended that the instructions do not tell the contractor how many lines of temporary bracing to use or which method. Examination of plaintiff's Exhibit 9 shows that the temporary cross bracing should be connected to the top chord of three or more trusses and the wall before continuing with erection. The diagram indicates that a "W" or two triangular bracings of four top chords should be used. Plaintiff's Exhibit 30 states:

> "ERECTION: H Series Trus Joists are normally erected with power equipment. It is often advantageous to erect joists in pairs, installing bracing and even secondary roof framing or sheathing on the ground before hoisting."

In addition, there is the testimony of the oral instructions to the contractor by a representative of defendant Components, Inc.; (4) it is contended there was no instruction for the installation of the plywood sheathing. Plaintiff's Exhibit 30, as just referred to, states that the sheathing may be put on joists in pairs on the ground before hoisting. It also states:

> "BRACING: * * * Do not attempt to install

[9] Plaintiff tried his case on the premise that the joists should be erected with only temporary struts or bracing on the 14 top chords. This is contrary to the evidence. Further, the contractor deliberately deviated from the proper installation procedure set forth in the printed instructions, which had been read.

roof sheathing * * * until all bridging is in place."

The only conclusion that can be drawn from the evidence in this case is that the warnings and instructions were proper and adequate; they had served their purpose in informing the contractor as to the installation procedure and the dangers imposed. The contractor and work crew understood the directions given but knowingly deviated from those instructions and used a "short-cut" procedure. The contractor simply failed to follow the clear and accurate directions given though it was aware of the instructions and warnings. The evidence shows that the foreman, Kauffman, began original construction on the auxiliary gymnasium by following the instructions and warnings provided by defendants. Thereafter, he was told by the superintendent, Dean May, to disregard defendants' instructions and those shown in the architect's drawings. Mr. May testified:

"Q. Were the directions of Trus-Joist being followed at that point [when collapse occurred]?

"A. Not exclusively, no.

"* * * * *.

"A. Well, I felt we made some errors."

At the time of ruling on defendants' motions for directed verdicts, the experienced trial court expressed serious doubt on submitting the case to the jury. He stated:

"* * * I do have some concern about the question of cause. * * *

"* * * * *.

"* * * Mr. May, who is superintendent on the job, read and understood the instructions to mean that they were to put the lines of bracing and the cross-bracing and all of that up and it should have

been up long before they got 14 of these girders up there?

"\* \* \* \* \*.

"\* \* \* You have all had Exhibit 9 [one of the printed instruction sheets]. It seems to me the inference fairly from that is that they are saying to you that you have to put up these lines of two-by-fours and cross-stuff and all that as you go along. And certainly, there is plenty of warning that these things are flexible and unstable, it seems to me. You look askance at that. It seems to me there is plenty of warning in there that that is true.

"\* \* \* \* \*.

"\* \* \* What I'm concerned about is where is the fault of these people? You see, the usual case you'd have of this kind is where they went ahead and followed what they put out and the thing goes down; then you have a case where you say you didn't do it right.

"But here, of course, you have got the twist to it. I think the evidence shows that what instructions were given, be they inadequate or not, or not sufficiently specific, were not followed."

In an often referred to case involving a plaintiff's failure to follow the printed directions of a manufacturer, where the instructions were clear and understandable, the court stated:

"We do not believe that the strict liability doctrine means that under circumstances such as we have here a consumer may knowingly violate the plain unambiguous instructions and ignore the warnings, then hold the makers, distributors and sellers of a product liable in the face of the obvious misuse of the product." *Procter & Gamble Manufacturing Co. v. Langley,* 422 SW2d 773, 780 (Tex Civ App 1967). Cited with approval in *McDevitt v. Standard Oil Company of Texas,* 391 F2d 364, 396 (5th Cir 1968).

Further, the deviation from instructions in the case at bar was not a "minor deviation" from the instructions for which a manufacturer may be liable. *See Phillips v. Kimwood Machine Co., supra* at 1353, n. 7.

We conclude from all of the above that there was no evidence to support the allegations in plaintiff's complaint and that defendants' motions for a directed verdict should have been granted.

Reversed.