Argued and submitted December 11, 1980, reversed
and remanded May 11, reconsideration denied June 18,
petition for review allowed August 4, 1981 (291 Or 419)

WILSON,
*Appellant,*
*v.*
B. F. GOODRICH COMPANY
*Respondent.*

(No. A7704-05292, CA 15106)

627 P2d 1280

Elden M. Rosenthal, Portland, argued the cause for appellant. With him on the briefs was Charles Paulson, Portland.

Donald C. McClain, Portland, argued the cause for respondent B. F. Goodrich Company. With him on the brief were Stewart M. Whipple and Whipple, Johansen & McClain, Portland.

No appearance for respondents General Motors Corporation and Murray Chevrolet Co.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

The plaintiff in this personal injury action appeals a judgment awarding him $30,000 and seeks a new trial on the issue of damages.

Plaintiff was injured when a "space saver spare tire," manufactured by defendant, exploded while he was inflating it. The method by which he attempted to inflate the tire differed in significant respects from the cautionary instructions affixed to the tire. The injuries plaintiff sustained were variously described by the witnesses. Generally, however, he suffered some degree of injury affecting the brain, with resulting effects on his behavior, his need for supervision and on the types of occupations he will be able to pursue.

The explosion occurred approximately one week before plaintiff's twentieth birthday. At that time, plaintiff had completed three days' employment as an assembly worker, earning approximately $2.30 an hour. Prior thereto, plaintiff had served in the Army for two years and four months. As a teenager, he had also worked at a McDonald's restaurant. Plaintiff did not complete high school and had some history of drug use.

Plaintiff's mother, as his conservator, brought this action in April, 1977, alleging in separate counts that his injuries were caused by the dangerously defective condition of the tire and by defendant's negligence. Plaintiff sought special damages of $19,469.63, $5,000,000 in general damages, $5,000,000 in punitive damages and damages for lost wages. Defendant denied plaintiff's material allegations and interposed affirmative defenses that plaintiff had misused the product and was contributorily negligent. The jury, by a special verdict, found that the tire was dangerously defective, that defendant was negligent, that plaintiff had misused the product, that plaintiff was contributorily negligent, that the parties were equally at fault for plaintiff's injuries, and that plaintiff had suffered total damages of $60,000. The court applied the comparative fault formula of ORS 18.470 and entered judgment for plaintiff in the amount of $30,000.

Plaintiff makes three assignments of error. The first is that the trial court erred by striking the testimony

of Dr. Russell Dawson and by instructing the jury to disregard his testimony. Dr. Dawson, an economist, testified about the projected loss of plaintiff's future earning capacity[1] over his lifetime, based on several assumptions—principally that, had he not been injured, plaintiff would at a minimum have participated in the work force at the level of a nonsupervisory factory worker. The witness proceeded to determine a total dollar figure of lost earnings for a person with plaintiff's working life expectancy, based on the industry-wide average wage and projected future wages of nonsupervisory factory workers. Dr. Dawson also testified regarding the cost of nursing care for plaintiff. The basis for the trial court's decision to strike the testimony, at least as to loss of earning capacity, was that it was speculative and therefore inadmissible. The court apparently based its ruling on *Plourd v. Southern Pac. Transp. Co.,* 266 Or 666, 513 P2d 1140 (1973) *(Plourd I).*

Defendant contends that the testimony on earning capacity was properly stricken, because no foundation was laid for the witness' assumption that plaintiff would have become a factory worker earning the wages the witness assumed. Plaintiff argues that the assumptions underlying the testimony were known to the jury, that the jury could agree or disagree whether the assumptions of the witness were supported by the evidence and that the testimony should have been admitted for the purpose of guiding the "jury in (a) the method of computing loss of future earning capacity; and (b) in providing statistical guidelines." Plaintiff also argues that, unless comparative statistical evidence of the kind in question is admissible, young plaintiffs with little or no work history will be unable to use the best possible evidence of loss of future earning capacity in personal injury cases.

---

[1] The term "earning capacity" is used in this case to refer to the projected dollar value of earnings plaintiff would have obtained over his working life had he not been injured. Technically, terms such as "loss of earning capacity" would more properly refer to loss or impairment of the ability to work, while terms such as "loss of earnings" would seem to be the more precise way to describe the actual or projected dollar loss resulting from lost capacity to earn. However, the Supreme Court has consistently used "earning capacity," and like terms, to refer to both meanings. *E.g., Plourd v. Southern Pac. Transp. Co.,* 266 Or 666, 513 P2d 1140 (1973); *Conachan v. Williams,* 266 Or 45, 511 P2d 392 (1973); *Holder v. Petty,* 267 Or 94, 514 P2d 1105 (1973).

The admissibility of Dr. Dawson's testimony turns on two interrelated tests: first, whether the witness' assumption that plaintiff would enter the labor market in a kind of job he had not previously held was too speculative to satisfy Oregon decisional law relating to proof of impairment of future earning capacity; and second, whether plaintiff's assumed future circumstances were demonstrably similar enough to those of the sample upon which Dr. Dawson based his computations in order to be admissible in light of *Plourd I* and other Oregon cases relating to the use of comparative statistics as evidence of lost earnings.

■ The basic principle governing admissibility of evidence of earning capacity, as stated by the court in *Brown v. O.-W. R. & N. Co.,* 63 Or 396, 409, 128 P 38 (1912), is that "any evidence which would indicate fairly the capacity of the plaintiff to earn money in his usual vocation, and the probability of his being able to do so in the future should be admitted;" but that "evidence [which] consists of mere guesswork and speculation upon what might happen in the future, * * * should be excluded."

In *Weinstein v. Wheeler,* 127 Or 406, 257 P 20, 271 P 733, 62 ALR 574 (1928), the court held that correspondence of the plaintiff "as to his intention to study for the concert stage," apparently adduced to show lost future earning capacity, was "entirely too uncertain and speculative to allow plaintiff to tell what he proposed to do in the future." 127 Or at 414. In *Conachan v. Williams,* 266 Or 45, 511 P2d 392 (1973), however, the court stated:

"On the question of impairment of earning capacity most courts now apparently hold that it is proper to consider not only plaintiff's actual employment at the time of his injury, but that under some circumstances consideration may also be given to other employments for which plaintiff was qualified at such time and the usual compensation paid for any such other employment. * * *

"Thus, in *Ramaswamy v. Hammond Lumber Co.,* 78 Or 407, 425, 152 P 223 (1915), this court held that:

" ' * * * [t]he fact that the plaintiff when injured was working as a common laborer at $2 per day would not prevent him from pleading and proving that he was skilled in another trade and capable of earning more: * * *.' "

However, the court added:

"It does not follow, however, even when the plaintiff has shown that he has the qualifications for employment in another position or for promotion to another position, that the compensation that he would have been paid in that position can be established by evidence consisting of average earnings of other persons * * *." 266 Or at 61-62.

*Conachan, Plourd I* and *Plourd v. Southern Pac. Transp. Co.,* 272 Or 35, 534 P2d 965 (1975) *(Plourd II),* are the leading Oregon cases relating to admissibility of comparative statistical evidence of impaired earning capacity. In *Plourd I,* a four-member majority of the Supreme Court (through the concurring opinion of Holman, J.) held that a projection of the plaintiff's loss of future wages, extrapolated from the earnings of another employee who performed similar services but who was somewhat junior to the plaintiff and was earning a larger salary, was inadmissible because

"* * * [t]he evidence relates to future *earning capacity.* The opinion assumes that because there is similar seniority, there is sufficient similarity between earning capacities to make what the other workman earned relevant. The error in that assumption is that plaintiff's demonstrated earning capacity is at variance with such an assumption. Without any showing why plaintiff earned less (i.e., temporary illness, injury, etc.), the jury is allowed to assume that in the future plaintiff will earn as much as the other workman. This is not a valid assumption in the face of proof of what they actually earned and in the absence of proof why plaintiff in the past has been earning less." 266 Or at 687. (Emphasis in original.)

The case was remanded, and, after retrial, substantially the same issue arose on appeal in *Plourd II.* At the second trial, the plaintiff's evidence was based on projections of the earnings of several employees who performed the same job as the plaintiff and who were proximate to him in seniority. More salient than the difference in the nature of the statistical evidence at the two trials is that the plaintiff also introduced evidence at the second trial to explain why his salary was less for the period in question than that of persons of corresponding seniority performing corresponding duties (e.g., adjustment of his work shifts to accommodate temporary domestic circumstances). The Supreme Court held that the evidence at the second trial was admissible and explained:

"* * * In considering the admissibility of that evidence in our first decision in this case we pointed out (at 681-82) that in our previous decision in *Conachan v. Williams,* 266 Or 45, 511 P2d 392 (1973), we had held (at 59) that any evidence which would 'indicate fairly the *capacity* of the plaintiff to earn money in his usual vocation' should be admitted. In *Conachan* we also recognized (at 61) that most courts now apparently hold that on the question of earning capacity it is proper to consider, under some circumstances, employment for which plaintiff was qualified at the time of his injury and the usual compensation paid for such employment. We also held in that case, however (at 65), that although a trial judge has considerable latitude in the admission or rejection of such evidence, there should be a showing as a foundation for the admission of such evidence that circumstances are sufficiently similar so as to provide a proper basis for an informed decision by the trial judge whether such evidence has sufficient probative value so as to be properly admissible.

"* * * * *

"In addition, it must be recognized, as pointed out in *Conachan v. Williams, supra* at 55-57, 64, that the issue in such cases is not the computation of plaintiff's actual future wage loss, which would often be impossible, but the impairment of plaintiff's future *earning capacity;* that proof of the present value of the impairment of the earning capacity of an injured workman is also not only difficult, but such evidence is seldom, if ever, conclusive, and that evidence of earnings of other employees is admissible upon the issue of impairment of future earning capacity if there is a 'substantial similarity' in the circumstances. Also, as we recognized in our previous decision in this case (266 Or at 682) and in *Conachan* (266 Or at 65) the trial judge has 'considerable latitude in the admission or rejection of such evidence' provided that he applies this standard in ruling upon the admissibility of such evidence.

"It must also be recognized, in our opinion, that it may well be impossible for an injured employee to find some other employees working under identical circumstances for the purposes of evidence of comparative earnings and projected computations of the present value of the impairment of his earning capacity, and that when, in such a case, the plaintiff has offered evidence based upon earnings of other employees who worked under circumstances most nearly comparable to his own circumstances, as in

this case, the differences in the circumstances of the plaintiff and of such other employees are matters which go to the weight to be given to such evidence by the jury, rather than to bar the admissibility of such evidence, provided that the circumstances are 'substantially similar.' " 272 Or at 37-38, 41-42. (Emphasis in original.)

In *Holder v. Petty,* 267 Or 94, 514 P2d 1105 (1973), the Supreme Court held that the rule prohibiting the reception of speculative evidence of lost earning capacity "is equally applicable in cases involving injuries to minors." 267 Or at 101. The issue in *Holder,* however, was not whether statistical evidence—or any other—offered to prove the quantum of lost future earnings was admissible, but whether a physician's testimony was admissible to show that the plaintiff's future occupational capabilities would be affected by his injury.

Plaintiff argues that the substantial similarity test of *Conachan* and the *Plourd* decisions should not be construed to exclude comparative statistical evidence of impaired capacity in cases such as this, where, unlike those cases, the injured person has no established work history. Plaintiff relies largely on cases from other jurisdictions, most notably *Krohmer v. Dahl,* 145 Mont 491, 402 P2d 979 (1965). There the plaintiff's decedent was a college student at the time of his fatal injury. The Montana court held that an economist was properly allowed to testify

"* * * to the possible earnings of classes of people of the same type as the decedent if they had survived through their normal life expectancy. Both the testimony and exhibits of Dr. Heliker were allowed over the objection that they were speculative.

"The information relied upon by Heliker was obtained chiefly from the United States Bureau of Census involving the 1960 census of population, and detailed characterizations in Montana for the year 1959. This information gathered by the Census Bureau was obtained by a 25 per cent random sample of the population of Montana. It shows the average income of the people of Montana at various ages and various degrees of intelligence. According to Heliker this Census Bureau data is used by economic researchers, insurance companies, financial agencies, and banks as the basis for statistical information." 145 Mont at 495, 402 P2d at 981.

The court explained:

> "This court agrees that the testimony and exhibits of Heliker were speculative in nature, but no more so than any other evidence that has for its purpose the proof of future action or events. The issue before the trial judge, as seen by this tribunal, was whether the testimony of Heliker should be allowed, in order to give the jury some basis upon which to reach a conclusion in regard to the possible future earnings of the decedent, or whether to leave the jury unguided and hope that by their common knowledge and sense of justice they might arrive at a more accurate estimation of damages. It appears to us that in this particular case the element of conjecture is reduced significantly by the admission of expert testimony as to the possible future earnings of the decedent. It also appears that this expert testimony is not only the best evidence, but the only evidence available in this case to prove future earnings." 145 Mont at 495, 402 P2d at 981.[2]

There is much to be said for the analysis in *Krohmer* and for plaintiff's argument. Statistical testimony of the kind involved here and in the cited cases necessarily rests on assumptions, which juries may or may not find consonant with the evidence presented to them. This case is an apt illustration: Dr. Dawson testified that plaintiff's lost earning capacity *alone* was equal to approximately $600,000; the jury found his *total* damages to be one-tenth that amount. Of course, the jury had been instructed to disregard Dr. Dawson's testimony. Nevertheless, the realities of the fact-finding process may suggest that any failure by the offering party to demonstrate substantial similarity between himself and his expert witness' statistical model should go to weight rather than admissibility. In the case of a young plaintiff without a work record, that proposition is more than philosophical: it may be indispensable to the ability to prove damages for impaired future earning capacity.

The substantial similarity of circumstance requirement for comparative statistical evidence may make little sense in cases involving minors or young plaintiffs without

---

[2] We note that the evidence in *Krohmer* differed from the evidence here, in that the plaintiff in *Krohmer* relied on random statistical data derived from the census and did not, like this plaintiff, base his projections on a particular assumed future status.

work histories. That requirement presupposes that specificity, which is a necessary prerequisite to substantial similarity, is either essential to or a measure of relevance. That presupposition is logical enough when a plaintiff's work history, education and training level and age level make it probable that his future employment, had he not been injured, would be identical or similar to his employment when injured. The presupposition is not logically compelling when the plaintiff is still in a formative stage of life and has not committed himself to any particular line of work; indeed, the less definable a young plaintiff's future is, the less similar any *specific* model can be and, therefore the less relevant any such model can be to predicting his future earning capacity.

■      If the substantial similarity test were not applicable to comparative statistics offered by young plaintiffs, the risk that their evidence will be speculative would of course be increased. The alternative, however, would be effectively to foreclose such plaintiffs from proving the amount of their impaired earning capacity. If they are not substantially similar to anything, comparative statistical proof could not be adduced by them and, absent a work history, they could not use their own past earnings as evidence of their future earning capacity. The better course, in our view, would be to require the assumptions underlying a young plaintiff's statistics to be presented to the factfinder, along with evidence from which the factfinder can test the validity of those assumptions. In other words, whether a young plaintiff's statistical evidence bears sufficient resemblance to his circumstances to be entitled to weight in the factfinding process—unless the evidence is not even colorably related to the plaintiff's future prospects—should be a question for the trier of fact to decide.

■      We conclude that the substantial similarity test of *Conachan* and *Plourd* applies to comparative statistical evidence offered by young plaintiffs to prove impaired earning capacity. There remains the question, however, of what "substantial similarity" means in the case of a young plaintiff whose prospects are far more open-ended than those of the injured persons in *Conachan* and *Plourd.*

Plaintiff argues here that

> "[t]he issue raised in this case is whether an economist may assume that an individual who has entered the labor force three days prior to his injury, who has two years of high school and average to above average intellectual and mechanical abilities, would *at a minimum* settle into employment as a factory worker. \* \* \*" (Emphasis plaintiff's.)

Although we find it unclear whether Dr. Dawson's assumption was that plaintiff would reach an employment level *no lower* than that of a factory worker or that he would *in fact* become a factory worker, defendant acknowledges in its brief that Dr. Dawson assumed "plaintiff would *at a minimum* settle into employment as a factory worker." (Emphasis added.)

Unlike *Weinstein v. Wheeler, supra,* where the evidence was based on a specific, and seemingly ephemeral, career goal, the evidence here was, in essence, based on *an example* of the lowest employment level plaintiff would be likely to reach, if his other evidence *(e.g.,* mechanical skills, intelligence, motivation, education, etc.) was believed. So viewed, the evidence satisfied the substantial similarity test. The circumstances of an average worker employed at the minimum occupational level plaintiff would predictably obtain are *predictably* similar to the circumstances plaintiff would have enjoyed had he become similarly employed. Because the Supreme Court has stated that likely future employments can be probative of impaired earning capacity *(Conachan,* at 61-62), and that minor plaintiffs without work histories are entitled to prove damages for lost earning capacity *(Holder,* at 102), it necessarily follows that, as applied to plaintiffs such as this one, "substantial similarity" includes "predictive similarity."

Defendant may well have been entitled to cautionary instructions that Dr. Dawson's testimony was based on assumptions and that those assumptions were only predictive. However, the granting of defendant's motion to strike the testimony, as it pertained to impaired earning capacity, was error which requires that we reverse and remand.

Plaintiff's second assignment is that the trial court erred in its responses to questions propounded by the jury

during deliberations. It is unlikely that this precise issue will arise on retrial and we do not discuss this claim of error.

Plaintiff's third assignment of error is:

"The trial court erred in permitting contributory negligence to go to the jury as to the products liability count."

We agree with plaintiff's contention that the trial judge was incorrect in concluding that "ordinary" contributory negligence, of the kind alleged by defendant, constituted a comparative fault defense to plaintiff's products liability allegations. *See Holdsclaw v. Warren,* 45 Or App 153, 607 P2d 1208, *rev den* 289 Or 209 (1980), which we decided after this case was tried. In *Holdsclaw,* we held that:

"Both parties rely on the Oregon Supreme Court's recent opinion in *Baccelleri v. Hyster Co.,* 287 Or 3, 597 P2d 351 (1979). Defendant maintains that *Baccelleri* holds that contributory negligence is a defense in strict liability actions. Plaintiff argues that the court in *Baccelleri* was referring to only a certain type of contributory negligence, *i.e.,* that which is sometimes called 'assumption of risk.' We agree with plaintiff.

"* * * * *

"The issue before the court in *Baccelleri* was whether that conduct which is sometimes *labeled* 'assumption of the risk' but which is, in reality, a species of contributory negligence rather than assumption of risk can be compared in the apportionment of damages. The court held that it could. *Id.,* at 10." 45 Or App at 156-57.[3] (Emphasis in original.)

We note, however, that here defendant's contributory negligence defense was properly submitted to the jury in connection with plaintiff's negligence allegations.

In addition to its contributory negligence defense, defendant pleaded an affirmative defense that plaintiff had misused the product. Defendant argues that "misuse is a recognized defense to an action in strict products liability," that misuse and assumption of the risk are both "subspecies of contributory negligence," and that

---

[3] Defendant's second affirmative defense (that plaintiff expressly assumed the risk of his injury by inflating the tire in a manner contrary to the warning label) was stricken by the trial court. Defendant has not cross-appealed and does not contend that the striking of that defense was error.

"[i]f a plaintiff misuses a product he is, of course, also acting negligently with regard thereto and allegations of misuse would, therefore, necessarily overlap with allegations of contributory negligence.

"* * * * *

"* * * All of the defendant's allegations of fault on plaintiff's part pertain to plaintiff's failure to heed the warnings or follow the instructions of the defendant or otherwise properly inflate the tire in question. As such, the case is clearly distinguishable from the *Holdsclaw vs. Warren* case wherein the plaintiff did not disregard any warnings or instructions with regard to the product involved and therefore the misuse defense could not properly be raised."

Defendant misses the point. It is not disputed that "misuse" is a defense to a products liability action. *See Anderson v. Klix Chemical,* 256 Or 199, 472 P2d 806, 53 ALR3d 227 (1970). However, contributory negligence is *not* a defense to an action based on products liability. Defendant pleaded separate affirmative defenses alleging misuse by plaintiff and contributory negligence. The allegations in those affirmative defenses were largely, but *not completely,* overlapping. The misuse allegation was an available defense to plaintiff's products liability count; the contributory negligence allegation was available as a comparative fault defense to plaintiff's negligence count; but the contributory negligence allegation was not an available defense to the products liability count.

The remaining question is whether the case should be remanded for a new trial on all issues or on the issue of damages only. Plaintiff argues that our remand should be limited to the issue of damages, because liability was determined at the first trial and no issue regarding liability has been raised on appeal. Plaintiff relies on *Skultety v. Humphreys,* 247 Or 450, 431 P2d 278 (1967), and states:

"As to the strict liability count, plaintiff contends that the type of contributory negligence submitted to the jury as an affirmative defense was not cognizable under Oregon law. This Court should affirm the finding that B.F. Goodrich was liable in strict liability, and instruct the trial court, upon the damages retrial, to enter a judgment order for the full amount of any money damage verdict awarded."

■ ■     The difficulty with plaintiff's argument is that defendant's allegations of contributory negligence *are* cognizable under Oregon law in connection with plaintiff's *negligence* count. Abstractly, the fact that evidence relevant to liability must be *presented* does not *necessarily* mean that the defendant, which did not cross-appeal, is entitled to have the issue of liability *re-adjudicated.* However, since the jury will hear evidence relevant to liability, we conclude that there is a significant possibility of prejudice to the defendant on the damages question if the jury is aware that that evidence has already been determined to establish liability. *See* Annotation, 29 ALR2d 1199, 1211-12 (1953). It is particularly clear that, where comparative fault is or can be germane to damages, there is a substantial risk of prejudice to the defendant if the jury is pre-instructed that *some* fault on the defendant's part exists. For similar reasons, we also conclude that, in light of the necessary overlap in the evidence relevant to liability and damages, the issues are not sufficiently separable to justify a remand limited to the question of damages. *See* Annotation, 29 ALR2d 1199, 1210-11 (1953); *cf. Brown v. Bonesteele,* 218 Or 312, 335, 344 P2d 928 (1959).

In *Maxwell v. Port. Terminal RR. Co.,* 253 Or 573, 456 P2d 484 (1969), the Supreme Court stated:

"In the ordinary two-party personal-injury case, however, evidence of fault can influence the jury's measurement of damages; and the kind and degree of injuries may influence some jurors in their evaluation of the evidence on liability. See Rosenberg, *Court Congestion; Status, Causes and Proposed Remedies,* in *The Courts, The Public and the Law Explosion* (Jones ed 1965). Whatever logical problems these elements of lawyer forklore may suggest, we believe that neither side in this type of case should be encouraged to manipulate errors in one trial to gain tactical advantage in a new trial before a new jury. Accordingly, we hold that the new trial in a personal-injury case ordinarily should be a new trial on all contested factual issues, regardless of the ability of the parties on appeal to pinpoint error so as to show that the error, if any, may have affected only one issue. There will of course, be exceptional cases in which the trial court, in the exercise of judicial discretion, properly will limit the issues for a new trial. But the standard to be applied in the exercise of this discretion is reasonable certainty that the issue or issues to

be eliminated from the second trial are no longer viable issues in the case and that their removal will not prejudice the right of either party to the kind of jury trial to which he would have been entitled but for the error or errors necessitating the new trial." 253 Or at 577.

In decisions more recent than *Maxwell,* the Supreme Court and this court have remanded cases for retrial on damages alone, where the circumstances were hardly "exceptional." *See, e.g., Weiss v. Northwest Accept. Corp.,* 274 Or 343, 546 P2d 1065 (1976); *Criqui v. Pearl Music Company,* 41 Or App 511, 599 P2d 1177, *rev den* 288 Or 173 (1979). The argument can be made that the quoted language from *Maxwell* presupposes that juries will not follow the court's instructions. In our view, however, a more convincing argument can be made that *Maxwell* recognizes a predictable reality about jury behavior to which courts should not be blind in fashioning remedies.

In any event, because the measure of damages in this case *cannot* be ascertained without evidence of liability on the negligence count and contributory negligence defense being produced, our remand is for a new trial of all issues.

Reversed and remanded.