Argued and submitted June 5, affirmed December 26, 2002

Jennifer Danielle BENJAMIN,
Personal Representative of the
Estate of Charles Schoggins,
*Respondent,*

*v.*

WAL-MART STORES, INC.,
an active Delaware corporation;
Coleman Outdoor Products, Inc.,
aka Coleman Company, Inc.,
aka New Coleman Holding, Inc.;
and G. I. Joes, Inc.,
an active Oregon corporation,
*Defendants,*

*and*

The COLEMAN COMPANY, INC.,
*Appellant.*

16-98-19033; A109788

61 P3d 257

445-a

Jonathan M. Hoffman argued the cause for appellant. With him on the briefs was Martin, Bischoff, Templeton, Langslet & Hoffman LLP.

Kathryn H. Clarke argued the cause for respondent. With her on the brief was Mustafa Kasubhai.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Charles Schoggins died while sleeping in a closed tent that was heated by a Coleman Focus 15 propane heater. Plaintiff, Schoggins's daughter and the personal representative of his estate, initiated this wrongful death action against defendant The Coleman Company, Inc. (Coleman), asserting claims for product liability and negligence.[1] The jury returned a verdict in favor of plaintiff on both claims, awarding $336,000 in economic damages and $433,000 in noneconomic damages. Coleman appeals, asserting nine assignments of error. We affirm.

## I. FACTUAL BACKGROUND

We begin with a general description of the relevant facts and leave to our discussion of each assignment of error the recitation of any additional facts that are relevant to those assignments. We take the facts from the record, viewing the evidence and reasonable inferences to be drawn therefrom in the light most favorable to plaintiff, the party in whose favor the jury returned its verdict. *McCathern v. Toyota Motor Corp.*, 332 Or 59, 62, 23 P3d 320 (2001).

Schoggins was a carpenter who lived in Bend. In October 1996, he was hired to work on a project in Philomath. For the first few days that he was at the work site, Schoggins slept in his car. A contractor on the job, David Anaya, slept in a nearby tent, which he intermittently warmed with a Coleman Focus 15 propane heater. Affixed to an upper portion of the heater was a decal approximately two and one-fourth inches wide and three inches high. The decal stated in part: "WARNING: FOR OUTDOOR USE ONLY. Never use inside house, camper, tent, vehicle or other unventilated or enclosed areas."

On the night of October 15, Anaya, his wife, and their two young daughters fell asleep in their tent while the Focus 15 heater was operating. Anaya woke about an hour later and discovered that his daughters were convulsing. He turned the heater off, opened the tent's windows, and carried

---

[1] Plaintiff also named Wal-Mart Stores, Inc., and G.I. Joe's, Inc., as defendants, but dismissed her claims against those defendants before trial.

the girls out of the tent. Neither he nor his wife was affected. At that time, Anaya assumed that the girls' symptoms were caused by carbon monoxide produced by the heater.

The next morning, as Anaya was preparing to return to Bend, Schoggins asked him to leave his tent and heater at the work site for Schoggins to use. Anaya agreed to do so. Anaya told Schoggins that, the previous night, his children had had convulsions and that he thought the heater might have had something to do with that reaction. Anaya told Schoggins to take care of the heater and said, "don't die in my tent." He said it "jokingly," and Schoggins replied with a chuckle. Anaya later recalled that, if he actually had had concerns about Schoggins's safety, he would not have let Schoggins use the heater.

That same day, Schoggins and a framer on the project, Dooms, received and cashed their paychecks. Schoggins, Dooms, and a third person, Falk, then went to a tavern where they ate lunch and drank "at least three or four pitchers" of beer between them. Around 4:00 p.m., Falk bought a case of beer; Schoggins drank "at least" one can on the way back to the work site. Around 9:30 p.m., Dooms went to his tent with Anaya's propane heater, which he lit and set on "high." Around 11:00 or 11:30 p.m., Schoggins came to Dooms's tent and got the heater. Schoggins took the heater to his tent, zipped himself and the heater inside, and apparently fell asleep. The next morning, he was found dead from carbon monoxide poisoning.

Plaintiff initiated this action. As pertinent here, in her second amended complaint, she alleged that Coleman engaged in the manufacture, distribution, and sale of Coleman heaters, that the Anayas purchased a Coleman Focus 15 propane heater, that Schoggins "installed and utilized" the heater in the tent in which he was sleeping, and that the heater caused a depletion of oxygen and an excessive production of carbon monoxide that caused Schoggins's death by asphyxiation. In her product liability claim, plaintiff further alleged that Coleman caused the heater to be sold with "limited instructions and notification as to its proper and safe use," that the heater was dangerously defective because it was not fit for its reasonably foreseeable use, and that

Coleman failed to warn consumers that the heater could cause asphyxiation. In her negligence claim, plaintiff further alleged that Coleman failed properly to manufacture or test the heater, failed to provide a safe heater for consumer use, and failed to warn Schoggins that the heater could cause asphyxiating conditions. Plaintiff sought $503,000 in economic damages and $500,000 in noneconomic damages.

Before trial, Coleman moved to exclude evidence or argument relating to the design and testing of, or incidents involving, dissimilar Coleman and non-Coleman heaters. Coleman also sought to exclude evidence of any incident involving a similar Coleman heater, to the extent that the incident was not substantially similar to the incident at issue here or Coleman was not aware of the incident at the time that the heater in this case was sold to Anaya. The trial court ruled that evidence of incidents involving Coleman's entire line of Focus heaters was admissible, because there was

> "a substantial similarity of the dangerous condition of this line of products which reduces the oxygen supply, releases carbon dioxide to a dangerous level when operated in a poorly ventilated or enclosed area, and it is the nature of the dangerous condition that is substantially similar, which is the allegation of the defect and the design defect in this matter."

The court ruled that the relevant date for purposes of notice to Coleman of such incidents was "the date that the defendant Coleman Company loses control of the product." The trial court later granted Coleman a continuing objection to the admission of such evidence.

Coleman separately moved to exclude all references to certain specified sources of economic damages that, according to Coleman, lacked evidentiary support, including, as pertinent here, any alleged loss of Schoggins's financial support of his son Dallas Schoggins, any alleged pecuniary loss to Schoggins's estate, and any alleged lost future income of Schoggins. The trial court denied Coleman's motion, stating that "[o]bjections can be made at the appropriate time."

At trial, plaintiff elicited the testimony of an economist, Michael Haynes, pertaining to plaintiff's economic

damages arising from Schoggins's death. At three points during and after Haynes's testimony, Coleman objected to and moved to strike the testimony. The trial court denied the motions. Plaintiff also elicited the testimony of Coleman's director of engineering, Randy May, regarding the design of Coleman's heaters; May testified regarding incidents involving Coleman heaters that had occurred before the heater in this case was sold, that is, before October 1994. Coleman moved to strike that testimony on the ground that May's testimony failed to demonstrate that Coleman knew about the incidents before October 1994. The trial court denied the motion.

Also during trial, Coleman moved for directed verdicts on plaintiff's product liability and negligence claims, arguing that plaintiff had failed to offer sufficient evidence of certain elements of each of those claims. By oral motion, Coleman also moved for a directed verdict on plaintiff's claim for economic damages. Coleman renewed its motions at the close of the evidence. The trial court denied the motions.

As noted above, the jury returned a verdict in favor of plaintiff on her product liability and negligence claims. The jury determined that Schoggins was not negligent. The jury awarded economic damages in the amount of $336,000 and noneconomic damages in the amount of $433,000. After judgment was entered, Coleman moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied those motions as well.

## II. ANALYSIS OF ASSIGNMENTS OF ERROR

On appeal, Coleman advances nine separate assignments of error: (1) the trial court erred in denying Coleman's motion for a directed verdict on plaintiff's product liability and negligence claims; (2) the court erred in permitting plaintiff's counsel to "display stacks of notebooks allegedly containing other incident information"; (3) the court erred by allowing other incident evidence; (4) the court erred in improperly instructing the jury regarding comparative fault; (5) the court erred in denying Coleman's motion *in limine* regarding improper evidence of economic damages; (6) the court erred in admitting the testimony of plaintiff's economist, Haynes; (7) the court erred in denying Coleman's

motion to strike Haynes's testimony; (8) the court erred in denying its renewed objection to Haynes's testimony; and (9) the court erred in denying Coleman's renewed motion for a directed verdict on the ground that there was an absence of evidence of economic damages. We address each assignment in turn.

## A. *Denial of Motions for Directed Verdict*

We begin with Coleman's first assignment, in which it argues that the trial court erred in denying its motions for directed verdict on plaintiff's product liability and negligence claims. Coleman argues that the court erred because plaintiff's evidence was insufficient to establish any defect in either the warnings or the design of the Focus 15 heater. Coleman identifies three ways in which plaintiff failed to prove that the warnings provided with the heater—including a warning affixed to the heater itself, a warning on the outside of the box, and a warning in the owner's manual—were defective. First, Coleman contends that, consistently with the *Restatement (Second) of Torts* § 402A comment j (1965), which has been adopted in Oregon, *see* ORS 30.920, it was entitled to assume that Schoggins would read and heed the warnings. Second, it points out that plaintiff's own witness testified that, if Schoggins had read and heeded the warnings, he would not have died. Third, Coleman contends that, where there was no evidence that Schoggins had read the warning that was provided, plaintiff failed to show that different warnings would have saved Schoggins's life—that is, plaintiff failed to demonstrate that any defect in the warnings caused Schoggins's death. As to the latter point, Coleman again relies in part on comment j, which provides that a seller is not required to warn of a danger or potentiality of danger that is "generally known and recognized"; in that regard, Coleman points out that it is undisputed that Schoggins had "actual and immediate" knowledge, by way of Anaya's warnings, of the dangers of using the heater inside a tent.

As to the design of the heater, Coleman contends that plaintiff's evidence of two possible alternative designs— one illustrated by a competitor's heater in which the thermocouple was located farther from the burner and one

involving the addition of an oxygen depletion sensor—was insufficient, because the first alternative design was manufactured two years after the Focus 15 at issue here was sold to Anaya and because the second alternative design had never been approved for use on an outdoor heater. Therefore, Coleman argues, there was no evidence that either alternative design was practicable or that either would have improved the overall safety of the product, as opposed to merely preventing the particular accident that occurred in this case. Coleman also argues that plaintiff failed to offer any evidence of what an ordinary consumer would expect from operating a Focus 15 heater in the manner in which Schoggins operated it.

Coleman asserts that plaintiff's evidence relating both to warnings and to defective design improperly focused on the heater at the time Schoggins used it, rather than at the time it left Coleman's control. It also argues that, if plaintiff's product defect claim fails for lack of evidence, her negligence claim must also fail because that claim also requires proof of defectiveness and unreasonable dangerousness, as well as proof of a lack of reasonable care. Finally, Coleman argues that, if this court finds evidence that the heater was defective in one of the ways alleged by plaintiff but not another, Coleman is entitled to a new trial, because the trial court submitted multiple allegations of defectiveness to the jury, the jury used a general verdict form, and, under *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 788 P2d 428 (1990), this court cannot tell if the jury reached its verdict based on an allegation that was supported by the evidence.

Plaintiff responds that, with respect to her defective warning allegation, Coleman itself introduced evidence about warnings on the packaging of the Focus 15 and in the accompanying owner's manual and that, in any event, there was evidence from which the jury could find that the heater's on-product warnings were inadequate, including evidence that a competitor's heater had a differently formatted and differently worded on-product warning. Plaintiff also argues that Schoggins's failure to read the on-product warning is not dispositive because the warning was inadequately designed and, even if read, would not have prevented the accident.

Plaintiff argues that there was sufficient evidence of causation in the form of her witness Tarald Kvalseth's testimony that the allegedly inadequate warning played a part in Schoggins's death.

Plaintiff further responds that, with respect to her defective design allegation, Coleman did not raise and preserve below its arguments relating to what an ordinary consumer would expect. On the merits, plaintiff contends that she proved that a heater design involving the alternative placement of a thermocouple was practicable and would increase overall safety, as well as prevent the particular death at issue here. Plaintiff also contends that she was not required to prove that a heater design involving an oxygen depletion sensor was currently used or approved for use on outdoor heaters in order to demonstrate that such a heater design was "available." Also as to the practicability of her proposed alternative designs, plaintiff argues that she was not required to demonstrate that any increase in cost would be "accepted in the marketplace."

Finally, plaintiff argues that, even assuming that it is preserved, Coleman's argument regarding the relationship between plaintiff's product liability claim and her negligence claim is not well taken because, according to plaintiff, there are differences between those two claims: the first requires evidence that a product is defective and unreasonably dangerous to an extent not contemplated by an ordinary consumer, while the second focuses on the question whether a manufacturer acted with reasonable care, regardless of consumer expectations—a question as to which plaintiff contends there was adequate evidence here.

We review the denial of a motion for a directed verdict by considering the evidence, including reasonable inferences, in the light most favorable to plaintiff, the nonmoving party. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). The verdict cannot be set aside "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements" of plaintiff's claim. *Id.*; *see also* Or Const, Art VII (Amended), § 3.

Under ORS 30.900, a person may bring a civil action against the manufacturer of a product for personal injury, death, or property damage arising out of a design or other defect in the product, ORS 30.900(1), or a failure to warn regarding the product, ORS 30.900(2). The elements of such a claim are set out in ORS 30.920: One who sells a product in a defective condition that is unreasonably dangerous to the user or consumer is liable if the seller is engaged in the business of selling such a product and the product is expected to and does reach the consumer without substantial change in the condition in which it is sold, regardless of whether the seller has exercised all possible care in the preparation and sale of the product and regardless of whether the injured party purchased the product from the seller. ORS 30.920(1), (2). The statutory standards set out in ORS 30.920(1) and (2) are to be construed in a manner consistent with comments a through m of section 402A of the *Restatement*. ORS 30.920(3).[2]

### 1. *Product liability claim: Failure to warn*

We begin by determining whether there was any evidence to support plaintiff's allegation that the Focus 15 heater was in a defective condition that was unreasonably dangerous to Schoggins by reason of Coleman's failure adequately to warn him regarding that product. ORS 30.900(2); ORS 30.920(1). As pertinent to that allegation, comment h of section 402A provides:

> "A product is not in a defective condition when it is safe for normal handling * * *. If the injury results from abnormal handling * * *, the seller is not liable. Where, however, [the seller] has reason to anticipate that danger may result from a particular use, * * * [the seller] may be required to give adequate warning of the danger (see Comment *j*), and a product sold without such warning is in a defective condition."

In turn, comment j provides, in part, that, "[i]n order to prevent the product from being unreasonably dangerous, the

---

[2] As this court noted in *Hoyt v. Vitek*, 134 Or App 271, 281, 894 P2d 1225 (1995), section 402A of the *Restatement (Second) of Torts* was applied in product liability cases in Oregon even before its adoption in ORS 30.920(3). *See Heaton v. Ford Motor Co.*, 248 Or 467, 470, 435 P2d 806 (1967).

seller may be required to give directions or warning, on the container, as to its use." It explains that a seller is required to give warning of a danger when the danger is "not generally known" and if the seller "has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge," of the presence of the danger. However, under comment j, a seller is "not required to warn with respect to products * * * when the danger, or potentiality of danger, is generally known and recognized." *See Gunstone v. Julius Blum GMbH.a-6873*, 111 Or App 332, 336-37, 825 P2d 1389, *rev den*, 313 Or 354 (1992) (the trial court correctly instructed the jury that, if the danger presented by the product in that case was "generally known and recognized," then the manufacturer "had no duty to warn of that danger" and the product "was not unreasonably dangerous *due to a lack of warning*" (emphasis in original)). Finally, comment j states that, "[w]here warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if [the warning] is followed, is not in defective condition, nor is it unreasonably dangerous." *See Schmeiser v. Trus Joist*, 273 Or 120, 133, 540 P2d 998 (1975) (citing comment j) (when a warning is actually given, the seller may reasonably assume that it will be read and heeded; a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous). *See generally Griffith v. Blatt*, 334 Or 456, 467, 51 P3d 1256 (2002) (noting the applicability of comments h and j to a product liability claim based on failure to warn); *Waddill v. Anchor Hocking, Inc.*, 149 Or App 464, 474, 944 P2d 957 (1997), *rev'd on other grounds*, 330 Or 376, 8 P3d 200 (2000), *on recons*, 331 Or 595, 18 P3d 1096 (2001) (allegations that the defendant had reason to anticipate that danger could result from a particular use of the defendant's product and that the product was sold without any warning as to what could occur as a result of that particular use stated a claim for product liability for failure to warn under comment h).

In *Anderson v. Klix Chemical*, 256 Or 199, 207, 472 P2d 806 (1970), the Supreme Court explained that a warning is adequate when it is "in such a form that it could reasonably be expected to catch the attention of the reasonably prudent

[person] in the circumstances of its use" and the content of the warning is "of such a nature as to be comprehensible to the average user and to convey a fair indication of *the nature and extent of the danger* to the mind of a reasonably prudent person." (Emphasis added; citation, internal quotation marks omitted.) More specifically as to the latter consideration, in *Schmeiser*, the Supreme Court explained that a "fair and adequate" warning is one that provides the user

> "fair and adequate notice of the possible *consequences* of use or even misuse. * * * The rule is that when a manufacturer undertakes by printed instructions to advise of the proper method of using [the] chattel, [the manufacturer] assumes the responsibility of giving accurate and adequate information with respect thereto, *including instructions as to the dangers involved in improper use*."

273 Or at 132 (quoting 2 *Hursh and Bailey, American Law of Products Liability* § 8:19, 192, 193 (2d ed 1974)) (emphasis added; internal quotation marks omitted; footnotes omitted in *Schmeiser*).

■■ A warning's adequacy is a proper subject of expert testimony. *McEwen v. Ortho Pharmaceutical*, 270 Or 375, 401 n 26, 528 P2d 522 (1974). The adequacy of a warning ordinarily is a jury question. *Reiger v. Toby Enterprises*, 45 Or App 679, 684, 609 P2d 402 (1980) (citing *Fulbright v. Klamath Gas Co.*, 271 Or 449, 533 P2d 316 (1975)).

■ In this case, it is apparent from the warnings with and on the Focus 15 heater that Coleman had anticipated the danger from "abnormal handling" or a "particular use" of the heater, namely, its use in a tent or other unventilated or enclosed area. We therefore need not determine whether there was evidence from which the jury could find that Coleman was required to warn the public of that danger. Accordingly, we proceed to consider whether there was evidence, including expert testimony, if any, from which the jury could find that Coleman's warnings were inadequate.

The primary source of evidence relating to the adequacy of the warnings associated with the Focus 15 heater was plaintiff's witness Kvalseth. Kvalseth is a professor of mechanical engineering with a specialty in human factors engineering, which, he explained, involves the "development

and use of information about human behavior, what the capabilities and limitations of people are, so that we can design equipment, tools * * * so that they can be used efficiently and safely." Kvalseth testified that, in order to make a product "reasonably safe for ordinary users, and [for] foreseeable misuse of a product too," a manufacturer would first attempt to design the product so as to avoid any hazards; if that is not possible, the manufacturer would "try to design guards or safety devices that may eliminate the hazard or * * * reduce the risk"; if that is not possible, "then we rely on the use of on-product warning signs to at least alert people that there is a potential hazard so they can protect themselves." Kvalseth testified that he had reviewed a textbook on the design of warning signs, as well as the American National Standards Institute (ANSI) standards relating to warning signs; that the latter included standards regarding the color, size, placement, content, and other aspects of warning signs; and that he had analyzed the warning on the Focus 15 heater in the light of those materials and standards. He testified that, in general terms, a warning

> "should identify what the hazard is, the seriousness of the hazard, and the reason that is important is that—those explain why a precaution or measure should be taken. Many people, if you tell them to do such and such or don't do such and such and you don't explain why it's important, many people don't heed it."

Kvalseth testified that, in his opinion, the warning label affixed to the Focus 15 heater did not meet the ANSI standard. He noted that the warning failed to state that, when used, the heater reduces oxygen and produces carbon monoxide and that the user should not operate the heater while sleeping. He also opined that the warning was inadequate because it did not use words such as "serious injury" or "death," did not state that a user could be "killed, you can get seriously injured at least, because of carbon monoxide poisoning," and did not alert the user that "their life may depend" on proper use.

Also, in regard to the content of the warning label affixed to the heater, Kvalseth testified that, in his opinion, the portion of the warning stating that the heater was for outdoor use only was "too vague for many people"; he opined

that "outdoors" could include anywhere other than the house in which a person lives, such as a "fish house" or "a tent in the middle of nowhere." Kvalseth also believed that the warning was "misleading" because it juxtaposed the caution against using the heater in "unventilated areas" to the caution relating to the risk of fire; according to Kvalseth, that juxtaposition might cause persons to think that the caution relating to ventilation related only to a risk of fire rather than to other risks such as asphyxiation.

Finally, Kvalseth opined that the warning label's lettering was too small; that the label's coloring was inadequate because it was black and white rather than a warning color such as orange; and that it was not located where it was easily visible.

The foregoing testimony constitutes ample evidence from which the jury could have found that the warning affixed to the heater was inadequate. In particular, there was evidence from which the jury could find that, although the warning told the user not to operate the heater in a tent or any other unventilated or enclosed area, it did not convey the "consequences"—that is, "the nature and extent of the danger"—of doing so. *Schmeiser*, 273 Or at 132; *Anderson*, 256 Or at 207. Based on Kvalseth's testimony regarding the size, color, and placement of the warning, the jury also could have found that the warning was not in a form that could reasonably be expected to "catch the attention" of a reasonable user. *Id.*

Coleman nevertheless contends that plaintiff's warning specifications must fail because Kvalseth expressed an opinion only as to the adequacy of the warning affixed to the heater itself and did not express an opinion concerning an additional warning that was included in the instructions provided with the heater and another warning on the heater's box—that is, the warnings that accompanied the heater at the time that Anaya initially purchased it. Those warnings stated, in part: "This heater consumes air (oxygen). Do not use in unventilated or enclosed areas to avoid endangering your life," and "For outdoor use only." Coleman contends that, because Kvalseth offered no opinion on the adequacy of

those warnings, plaintiff's evidence was insufficient as a matter of law to demonstrate that the warnings, considered in their entirety, were inadequate.

Coleman's argument rests on an unwarranted assumption that an expert must express an opinion as to the adequacy of warnings for the issue to go to the jury. Again, the adequacy of warnings is a question for the jury. *Reiger*, 45 Or App at 684. That requires that there be *evidence* in the record from which the jury could arrive at an answer to the question. As discussed above, Kvalseth testified in detail regarding the features of adequate warnings generally, including their preferred form and content. The fact that Kvalseth also rendered an opinion about the specific warning affixed to the heater at issue in this case did not prevent the jury from determining for itself, based on the general information provided by Kvalseth, the adequacy of the other warnings provided with the heater or the adequacy of the warnings as a whole.

■■■ The question remains whether there was evidence from which the jury could find that it was more probable than not that the inadequate warnings were the cause of Schoggins's death. *Russell v. Ford Motor Company*, 281 Or 587, 595, 575 P2d 1383 (1978). Such evidence may be circumstantial, if there is no direct evidence. *Newman v. Utility Trailer*, 278 Or 395, 402-05, 564 P2d 674 (1977). Expert testimony demonstrating or allowing a jury to draw an inference that an adequate warning generally is effective in preventing a particular type of accident can be sufficient to prove causation. *Baccelleri v. Hyster Corp.*, 287 Or 3, 7, 597 P2d 351 (1979). As in the case of other categories of product defect, an inadequate warning must be a "substantial" cause of the person's injuries. *Cf. Vaughn v. Searle & Co.*, 272 Or 367, 372, 536 P2d 1247 (1975), *cert den*, 423 US 1054 (1976).

Coleman argues that there was no evidence supporting causation because there was no evidence that Schoggins read the warning on the heater. In addition, it argues that, because there was evidence that Schoggins disregarded Anaya's warning regarding the heater, the jury could not

properly infer that Schoggins would have heeded any warnings on the heater. Finally, Coleman notes that Kvalseth testified that he "can't say that had there been a properly designed warning, this accident wouldn't have happened." Plaintiff responds that there was sufficient evidence of causation, including Kvalseth's testimony that a differently designed warning would be "helpful" to a user of the product, and that the jury therefore could find that the inadequate warning substantially contributed to Schoggins's death.

We agree with plaintiff. Kvalseth described the warning on another model of heater as stating that the heater consumes air; as warning the user not to use the heater when sleeping or in an unventilated structure "to avoid endangering your life"; and as instructing the user as to the size of "openings" required to provide proper ventilation. Kvalseth testified that those warnings "identify what potential hazards are here" and tell the user "the gravity of the hazards"; he stated, "If you read this, you know you can get killed from it." Plaintiff also presented evidence of a model warning for portable radiant heaters, which included the statement "CARBON MONOXIDE CAN KILL YOU," a red triangle containing a skull and crossbones and the chemical symbol "CO," and the statement, "Using a portable gas camping heater inside a tent * * * or other enclosed area can produce deadly Carbon Monoxide," as well as information on the symptoms of carbon monoxide poisoning. Kvalseth testified that

"you see something like that of course, and you will think twice about what it involves. * * * I'm not going to go ahead, you know, unless I find out more, when I read the rest of it, when I see something like that. * * * [S]o you look at that and you realize, there's poison involved here."

He also opined that, "[i]f a user isn't familiar with the product, and if you have a well-designed warning, it's much more likely he's going to read it * * *." Finally, Kvalseth testified that "[w]arnings can and do change people's behavior, if they are done properly." Considering all of the above evidence and testimony, there was ample evidence from which the jury could have found that the inadequate warning on the Focus

15 heater was a substantial factor in causing Schoggins's death.

■ The fact that Schoggins "ignored" Anaya's "warning" is of no moment. Anaya testified that he did not know whether the heater caused his children's convulsions and that he told Schoggins "don't die in my tent" as a joke, not as an actual warning, and that Schoggins "chuckled" in reply. Anaya said that, if he actually had had concerns about the safety of the heater, he would not have let Schoggins use it. Certainly, the jury was entitled to believe Anaya's testimony that he intended, and Schoggins took, the "warning" as a joke.

■ Nor is it significant that the evidence does not show that Schoggins actually read the warning on the heater. There was evidence that one of the ways in which the warning was defective was that its design was insufficient to draw a user's attention to the warning, such as by a brighter color or larger typeface. The jury could infer from that testimony, as well, that Schoggins likely would have noticed, read, and heeded a differently designed warning.

The trial court did not err in denying Coleman's motion for directed verdict on plaintiff's failure to warn allegation.

### 2. *Product liability claim: Defective design*

■ We turn to whether there was evidence from which the jury could have found that the Focus 15 was defectively designed. In *McCathern*, the Supreme Court explained that, in enacting ORS 30.920, the legislature intended to adopt the "consumer expectations" test of liability for a product's defective design and that, in order to prove liability under that test, the plaintiff must prove (1) that, at the time it leaves the seller's hands, the product is in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him or her; and (2) that the product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. 332 Or at 75-77 (citing *Restatement* at § 402A, comments

g (defining "defective"), and i (defining "unreasonably dangerous")). As the court explained,

> "[w]hether a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer is a factual question to be determined by the jury. It is the trial court's role, however, to ensure that the evidence is sufficient for the jury to make an informed decision about what ordinary consumers expect."

*McCathern*, 332 Or at 77 (citation omitted).

■ As to what constitutes sufficient evidence to show that a product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer, "in some cases, consumer expectations about how a product should perform under specific circumstances will be within the realm of jurors' common experience." *Id.* at 78 (citing *Heaton v. Ford Motor Co.*, 248 Or 467, 472, 435 P2d 806 (1967)). Where a product or the circumstances at issue are not within the common knowledge or experience of jurors, however, a plaintiff must produce additional evidence regarding consumer expectations. *McCathern*, 332 Or at 78.

■ Such evidence may—but is not required to—consist of evidence that the magnitude of the product's risk outweighs its utility, which itself may be proved by demonstrating that a safer design alternative was both "practicable and feasible." *Id.* Other evidence relevant to the issue includes, for example, evidence of advertising and promotional materials demonstrating what the ordinary consumer was led to expect in regard to the product's performance. *Id.* at 79. The relevant question is not what consumers *should* expect or how a product *should* perform; rather, the jury is to determine "the basically factual question of what reasonable consumers *do* expect from the product." *Heaton*, 248 Or at 474 (emphasis added).

In this case, Coleman asserts that plaintiff failed to show that ordinary consumers would not expect a risk of carbon monoxide poisoning from using a propane heater in an enclosed space. Coleman argues that plaintiff's attempt to demonstrate that consumers would not expect such a risk depended on her evidence of two alternative designs and that that evidence was insufficient for that purpose because the

evidence shows that the first alternative design, in which a thermocoupling device was placed farther from the burner than in the Focus 15 heater, was not manufactured until two years after the heater in this case left Coleman's hands; and because there is evidence showing that the second alternative design, involving incorporation of an oxygen depletion sensor (ODS), has never been approved for outdoor heaters, would encourage consumer misuse, and would double the cost of the heater. Thus, Coleman argues, there was no evidence that either of those alternative designs was a safer, practicable alternative as of October 1994 or that those changes would produce a safer overall design or would reduce the cost of the heater. Plaintiff responds that there was sufficient evidence in the record to submit to the jury the question whether the Focus 15 met consumer expectations.

We agree with plaintiff. At trial, she offered the testimony of Robert Engberg, a mechanical engineer with experience in designing gas systems and in investigating accidents involving liquefied petroleum gases, including propane. Engberg testified in part regarding oxygen depletion sensors; he testified that they consist of a "pilot light and thermocouple assembly," described their operation, testified that they "are very widely used in Europe and are becoming common and more used in the United States," and testified that they have been commercially available since at least 1982. He also testified that he believed that it was feasible to have incorporated an ODS on a Coleman Focus 15 heater and that, when he modified a Focus 15 heater by incorporating an ODS, the heater shut down before it produced a dangerous level of carbon monoxide. Engberg opined that incorporation of an ODS into the Focus 15 heater was a reasonable alternative design that would have made the heater safer and that the additional production cost of a Focus 15 heater that included an ODS would be $18.65.

We conclude that Engberg's testimony constitutes evidence from which the jury could have found that, at the time the Focus 15 heater left Coleman's hands, it was in a condition not contemplated by the ultimate consumer and was unreasonably dangerous to that consumer, that is, was dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the

ordinary knowledge common to the community as to its characteristics. Specifically, the jury could have found from Engberg's testimony that incorporating an ODS device would have constituted a safer design and that that design was practicable and feasible. The evidence was sufficient for the jury to find that those devices had been commercially available since at least 1982. The trial court did not err in denying Coleman's motion for a directed verdict on plaintiff's defective design allegation.

### 3. *Negligence claim*

We turn to whether the trial court erred in denying Coleman's motion for a directed verdict on plaintiff's negligence claim. Coleman asserts that, if evidence was lacking from which the jury could find that its products were defective, it was entitled to a directed verdict on that claim as well. It also asserts that, even assuming that plaintiff proved defectiveness, she failed to prove that it did not exercise due care in manufacturing or selling the product.

Plaintiff responds that, in its directed verdict motion, Coleman did not assert that plaintiff failed to prove lack of reasonable care and that it therefore did not preserve that argument for appeal. She also argues that, in any event, there is evidence from which the jury could find that Coleman acted unreasonably in light of foreseeable harm to users of the Focus 15, including testimony by both Kvalseth and Engberg to the effect that consumers foreseeably would use portable heaters in tents or other areas that they perceived to be "outdoors" or "ventilated" and Kvalseth's testimony regarding the inadequacy of the warnings to address the risks of doing so.

We begin with plaintiff's contention that at least a substantial portion of Coleman's argument on appeal—that there was no evidence of Coleman's lack of reasonable or due care—was not preserved. At trial, Coleman moved for a directed verdict on the negligence claim. It argued that a claim of negligence based on a defective product "has the same elements as a strict liability claim with the added element of breach of duty to make a safe product." Coleman did not argue, however, that there was insufficient evidence of that asserted additional element. Instead, it argued only that

"because [plaintiff's] claim, or elements of her claim, for strict liability fail, the same elements fail in her negligence claim. Accordingly, plaintiff's negligence claim fails in its entirety."

Thus, even assuming that Coleman is correct that there is an "added element" in negligence claims, the fact remains that it never presented to the trial court—and therefore did not preserve for appeal—the issue that plaintiff failed to establish that additional element. The only issue was whether the negligence claim failed for the same reason that the product liability claim failed.

We turn, then, to the latter argument, which Coleman renews on appeal. As we have already concluded, plaintiff's product liability claim does not fail for insufficient evidence in any of the particulars that Coleman advances. We therefore conclude that the trial court also did not err in denying Coleman's motion for a directed verdict on plaintiff's negligence claim.

## B. *Display of Notebooks*

In its second assignment of error, Coleman argues that the trial court "committed prejudicial error by permitting plaintiff's counsel to display [to the jury] stacks of notebooks allegedly containing other incident information." The "other incident" information concerns other incidents in which individuals died after using Coleman heaters to heat indoor premises. Plaintiff responds that Coleman is not entitled to relief in this court regarding the notebooks because Coleman never asked the trial court for any specific relief, such as moving for a mistrial based on Coleman's counsel's alleged "flaunting" of the notebooks. Coleman advances no reply to that argument.

We agree with plaintiff. If a party does not identify a specific legal, procedural, factual, or other ruling by the trial court, ORAP 5.45(3), there is nothing for this court to review. We therefore reject Coleman's second assignment of error without further discussion.

## C. *Admissibility of Evidence of Similar Incidents*

We turn next to Coleman's third assignment of error, in which it argues that the trial court erred in admitting,

without sufficient foundation, testimony regarding other incidents involving Coleman heaters and in denying Coleman's motion to strike that testimony. Before trial, Coleman moved for an order excluding such evidence. The trial court denied that motion in part, allowing evidence of any incident involving any model of Coleman heater as to which incident Coleman had notice before the date of sale of the heater sold to Anaya, namely, October 1994. At trial, plaintiff called as an adverse witness Randy May, Coleman's director of engineering and one of the designers of the Focus line of heaters. On direct examination, May testified that he knew of certain other incidents involving Coleman heaters, particularly a model called the Focus 5. As to when he knew, May testified, in part, as follows:

"[Plaintiff's Counsel]: Well, you did find out, sir, that people weren't following your instructions with the Focus 5, and they were taking them into tents, vans, and campers; isn't that right, sir?

"[May]: Well, that particular product, we allowed them to use that inside tents and campers and vans and those type of, you know, environments as long as they followed the instructions that [were] on the product. I mean, they were intended for that type of use. Small heaters for tents and campers.

"[Plaintiff's Counsel]: And you learned in the early 1900s—1990s, excuse me, that people were dying because they took those Focus 5s into tents, campers, and vans; isn't that right, sir?

"[May]: And didn't follow some of the instructions that [were] on the product, yes.

"[Plaintiff's Counsel]: I'm not talking about instructions, sir. I know they're your instructions and you want to keep answering that way. But you found out in the early 1990s that people were dying from carbon monoxide poisoning when they took your Focus 5 heaters inside tents, vans, and campers; isn't that right, sir?

"[May]: Well, we knew we had had several accidents in the early 1990s, involving those products being used inside of a tent or inside of a camper.

"[Plaintiff's Counsel]: All right.

"[May]: We knew that, yes.

"[Plaintiff's Counsel]: Okay. And people died.

"[May]: In those cases they did, yes.

"[Plaintiff's Counsel]: And they died from carbon monoxide poisoning, didn't they, sir?

"[May]: Yes.

"[Plaintiff's Counsel]: Okay. And that's because your Focus 5 heater was depleting the oxygen in those spaces and creating deadly carbon monoxide; isn't that right, sir?

"[May]: Well, in those particular accidents I'm talking about, that's not necessarily the case. That was part of the case.

"[Plaintiff's Counsel]: Sure.

"[May]: But there were some other factors.

"[Plaintiff's Counsel]: But they all died of carbon monoxide, didn't they?

"[May]: Yes."

Plaintiff's counsel later asked May about a number of specific incidents involving Coleman heaters that had occurred before October 1994.

Following May's testimony, Coleman moved to strike the testimony regarding incidents that occurred before October 1994 on the ground that "there was not established in any of that testimony the date of notice to [Coleman]." The trial court denied the motion. After the jury returned its verdict, Coleman moved for judgment notwithstanding the verdict or, in the alternative, a new trial, based in part on the purported lack of foundation for May's testimony regarding the pre-October 1994 "other incidents." The trial court denied Coleman's motion.

On appeal, Coleman asserts that the trial court erred in denying its motion to strike May's testimony.[3] Specifically, Coleman complains that May's testimony demonstrated only that Coleman knew of the other incidents, not

---

[3] We note that, in its combined argument on its second and third assignments of error, Coleman also asserts that the trial court erred by permitting certain opening statements and closing arguments by plaintiff's counsel. Because Coleman does not separately and specifically assign error to those occurrences, we do not consider them. ORAP 5.45(2).

when it knew, and that the evidence and inferences relied on by plaintiff at trial were not sufficient to remedy that deficiency. In response, plaintiff argues that Coleman's motion to strike was untimely and that, in any event, the jury could find that Coleman knew of the incidents at the time it sold the heater at issue in this case from May's testimony, not objected to by Coleman, regarding what Coleman had "learned" in the "early 1990s" and his testimony regarding Coleman's actions following a 1992 Consumer Product Safety Commission investigation. In reply, Coleman insists that there was no evidence of the dates when Coleman received notice of the alleged similar incidents.

Coleman's assignment of error presents a question of conditional relevancy. OEC 104 provides, in part:

"(1) Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

"(2) When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

As the legislative commentary to the Oregon Evidence Code explains, in some situations the relevance of an item of evidence depends upon the existence of a particular preliminary fact. "Relevancy in this sense has been labeled 'conditional relevancy.'" *See* Laird C. Kirkpatrick, *Oregon Evidence* § 104.04, Art I-32-37 (4th ed 2002). If there is sufficient foundational evidence to support a finding by the jury that the condition of fact has been fulfilled, the evidence is admitted. If, however, the trial court concludes that a reasonable jury could not find that the preliminary condition of fact has been proven, the court must exclude the evidence or, if it already has been admitted, withdraw the matter from the jury's consideration. *Id.* On appeal, the court reviews whether there was sufficient evidence for the trial court to have submitted the issue to the jury; that is, whether the foundation evidence was sufficient for the jury reasonably to have found that the

condition on which relevance depended was fulfilled. *State v. McNeely*, 330 Or 457, 462, 8 P3d 212, *cert den*, 531 US 1055 (2000). We view the record as consistent with the trial court's ruling, accepting reasonable inferences and reasonable credibility choices that the trial judge could have made. *Id.*

■ We first reject plaintiff's argument that Coleman's motion to strike was untimely. As discussed, under OEC 104(2), evidence may be received subject to later introduction of evidence sufficient to support a finding that the condition for admission was met. Thus, in the context of conditionally relevant evidence, a motion to strike is timely if made at the conclusion of a witness's testimony, because that is a time at which the trial court properly can assess whether sufficient evidence of the conditional fact has been adduced. *See also State v. Keller*, 315 Or 273, 283, 844 P2d 195 (1993) (an objection is "timely" if it is made as soon as its applicability to the offered evidence is known to the opponent of the evidence and when the trial court has the basis properly to assess its admissibility). That is what occurred here.

■ We turn to whether there was sufficient evidence from which the jury could have found that Coleman knew, before October 1994, of the other incidents testified to by May. We conclude that there was. As quoted above, on direct examination, plaintiff asked May whether he "learned in the early 1900s—1990s, excuse me, that people were dying because they took those Focus 5s into tents, campers, and vans." May replied: "And didn't follow some of the instructions that [were] on the product; yes." That evidence—as well as the permissible inference that "the early * * * 1990s" meant before October 1994—was enough for the jury to find that Coleman knew, before October 1994, of the incidents elsewhere admitted into evidence. Because there was sufficient foundation evidence for the jury to have found that the condition on which the relevance of the other incidents depended had been satisfied, the trial court did not err in denying Coleman's motion to strike evidence of the other incidents.

D. *Jury Instruction Concerning Comparative Fault*

At trial, the court gave the following instruction to the jury concerning comparative fault:

"In the claim for strict [product] liability, contributory negligence of the deceased is not a defense when such negligence consists merely in a failure to discover the defect in the product or to guard against the possibility of its existence."

At the conclusion of jury instructions, Coleman stated that "[w]e would except to plaintiff's submitted instructions," including the foregoing one concerning comparative fault.

In its fourth assignment of error, Coleman asserts that the trial court's comparative fault instruction was erroneous. According to Coleman, the instruction omitted certain essential components of the instruction as established in *Sandford v. Chevrolet Div. of General Motors*, 292 Or 590, 642 P2d 624 (1982), namely, that the failure of the deceased to discover or guard against an alleged defect in the product must have been merely "unobservant, inattentive, ignorant, or awkward." Coleman also argues that, in any event, plaintiff was not entitled to even the correct instruction, because there was no evidence from which the jury reasonably could have found that Schoggins's death resulted, in whole or in part, from an "unobservant, inattentive, ignorant, or awkward" failure to discover or guard against alleged defects in the Focus 15 heater. According to Coleman, the record here demonstrates that Schoggins was repeatedly warned about the danger of using the heater inside a tent and his failure to discover or guard against any defect in the heater therefore was more than those things. Plaintiff responds that, among other things, Coleman failed to preserve its exception to the quoted instruction because it did not state the specific ground for its exception as required under ORCP 59 H.

For a different, albeit related, reason, we agree with plaintiff that Coleman failed to preserve its exception to the challenged instruction. Under ORCP 59 H, a party must "particularly state[ ]" to the trial court its "point of exception" to an instruction. That rule is not itself the *source* of this court's requirements for preservation of issues relating to jury instructions. *See Leiseth v. Fred Meyer, Inc.*, 185 Or App 53, 56 n 1, 57 P3d 914 (2002) (so noting); *see also Lincoln Loan Co. v. City of Portland*, 335 Or 105, 110, 59 P3d

521 (2002). Nevertheless, it is consistent with one of the policy reasons underlying the latter, namely, "to ensure that the positions of the parties are presented clearly to the lower court and that parties are not denied the opportunity to meet a particular argument." *See Budden v. Dykstra*, 181 Or App 523, 527, 47 P3d 49 (2002). Here, in failing to make known to the trial court the basis of its objection to the court's comparative fault instruction, as required by ORCP 59 H, Coleman also failed to preserve that issue for appeal. We therefore reject without further consideration Coleman's fourth assignment of error.

E. *Evidence of Economic Damages*

In its fifth through ninth assignments of error, Coleman contends that the trial court erred in various respects in admitting evidence relating to plaintiff's economic damages. In its fifth assignment of error, it contends that the trial court erred in denying its motion *in limine* to exclude any evidence relating to Schoggins's estate assets, lost income, or financial support to his son Dallas Schoggins, on the ground that Schoggins had deliberately failed to maintain any records of his past income. Coleman also argues that the testimony of plaintiff's witness Haynes, an economist, "lacked foundation" because Haynes unjustifiably assumed that, had he not died, Schoggins would have worked 40 hours a week, eight months a year, throughout his working life.

In its sixth assignment of error, Coleman contends that the trial court erred in admitting Haynes's testimony regarding his projections of Coleman's future earning capacity; according to Coleman, that testimony was inadmissible because Haynes testified that one of the factors on which he relies to reach an opinion about a person's future earning capacity is the person's "base income," and there were no records of Schoggins's past income.

In its seventh assignment of error, Coleman asserts that the trial court erred in overruling its objection to, and denying its motion to strike, Haynes's testimony on the ground that the proper measures of damages in a wrongful death case were the loss of support sustained by Schoggins's children and the loss to the pecuniary value of his estate; Coleman contended at trial that Haynes's testimony was

irrelevant because, as to the former, there was no evidence of the amount of support that either of Schoggins's children had received or could have expected to receive and, as to the latter, Haynes had testified only as to Schoggins's future earning capacity and not as to any expected accumulation of assets.

In its eighth assignment of error, Coleman contends that the trial court erred in overruling its objections to, and denying its motion to strike, Haynes's testimony made in part on the ground that Haynes based his estimate of Schoggins's future earnings on estimated gross income rather than on net income, as Coleman asserts was required under *Pumpelly v. Reeves*, 273 Or 808, 543 P2d 682 (1975).

Finally, in its ninth assignment of error, Coleman asserts that the trial court erred in denying its motions for directed verdict on plaintiff's damages claim based on the lack of nonspeculative evidence regarding economic damages.

As to Coleman's fifth assignment, plaintiff responds that the trial court correctly denied Coleman's motion *in limine* to exclude evidence of plaintiff's economic damages because economic damages need not be proved by documentary evidence.

As to Coleman's sixth assignment, plaintiff asserts that Haynes's testimony was admissible despite the absence of records of Schoggins's income because there was sufficient evidence of Schoggins's work habits, job skills, and other factors to enable Haynes to project his annual and lifetime earnings capacity based on similarities to the earnings of other individuals.

As to Coleman's seventh assignment, plaintiff asserts that, under *Goheen v. General Motors*, 263 Or 145, 502 P2d 223 (1972), evidence of earning capacity is relevant to the jury's determination of economic damages, including claims of loss to an estate in a wrongful death case.

Plaintiff contends that Coleman's eighth assignment is unavailing because Coleman's objection to Haynes's testimony on the ground that it involved gross, rather than net, income was untimely under OEC 103(1)(a) and *Keller*, 315 Or

at 283. In any event, plaintiff contends, the question whether Schoggins's earnings were subject to overhead expenses or other deductions went to the weight, not the admissibility, of the testimony.

Finally, as to Coleman's ninth assignment, plaintiff asserts that evidence at trial, including evidence not challenged by Coleman relating to Schoggins's occupation, skill, experience level, and pay rate and evidence relating to the pay of his coworkers, was sufficient to allow submission of the issue of plaintiff's damages to the jury.

■ We dispose of those assignments slightly out of order beginning with the seventh, in which Coleman challenges the admission of Haynes's testimony as to Schoggins's future earning capacity on relevancy grounds. As plaintiff correctly contends, under *Goheen*, such evidence properly was submitted to the jury for the purpose of determining the existence and extent of any pecuniary loss to Schoggins's estate, as provided in ORS 30.020(2)(c). Similarly, Schoggins's earning capacity also is relevant to the issue of the amount of monetary support that he would have provided to his family during his lifetime, that is, for the purpose of determining any pecuniary loss to Schoggins's surviving beneficiaries. ORS 30.020(2)(d). Regarding the latter issue, any evidence that Schoggins previously had not provided such support went to the weight of the testimony, not its admissibility. In short, we reject Coleman's seventh assignment of error.

■ Next, we agree with plaintiff that Coleman's motion to strike Haynes's testimony on the ground asserted in its eighth assignment of error was untimely under *Keller*. We therefore affirm the trial court's denial of that motion without further discussion.

■ We turn to Coleman's fifth, six, and ninth assignments of error, each of which, in effect, challenges the sufficiency of plaintiff's damages evidence on the ground that the evidence was speculative. As pertinent to those assignments, ORS 18.560 sets out standards for awards of economic and noneconomic damages in civil actions. *See Greist v. Phillips*, 322 Or 281, 288-89, 906 P2d 789 (1995) (applying ORS 18.560(1) to noneconomic damages awarded in wrongful

death action under ORS 30.010 to 30.100). Under ORS 18.560(2)(a), economic damages are

> "*objectively verifiable monetary losses* including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less."

(Emphasis added.) In *Kahn v. Pony Express Courier Corp.*, 173 Or App 127, 160, 20 P3d 837, *rev den*, 332 Or 518 (2001), we explained that the phrase "objectively verifiable" in that provision means "*capable* of confirmation by reference to empirical facts" and that that standard "does not impose a particular quantum of proof for recovery of such damages." (Emphasis in original; citation, internal quotation marks omitted.)

 That is consistent with the standard generally applicable to proof of loss of future earnings, which has been expressed as "reasonable certainty." As the Supreme Court explained in *Tadsen v. Praegitzer Industries*, 324 Or 465, 472, 928 P2d 980 (1996), a claim for lost future earnings

> "necessarily rests on some quantum of evidence that would allow the jury to find that certain events probably would have occurred, or that certain conditions probably would have existed, had it not been for a defendant's wrongful conduct. * * * Only reasonable probability is required."

*See also Conachan v. Williams*, 266 Or 45, 55-56, 511 P2d 392 (1973); *City of Eugene v. Monaco*, 171 Or App 681, 688-89, 17 P3d 544 (2000), *rev den*, 332 Or 240 (2001) (" 'Reasonable certainty' is not a demanding standard. Lack of absolute certainty does not bar submission of a claim for lost profits[.]" (citation omitted)). The present value of future earnings losses is a proper subject of expert testimony. *Tadsen*, 324 Or at 472. The question whether the claimed damages were proven is a question of fact for the jury. *Id.* at 473.

The Supreme Court's decision in *Wilson v. B. F. Goodrich*, 292 Or 626, 642 P2d 644 (1982), is instructive. The plaintiff was injured when a tire manufactured by the defendant exploded. *Id.* at 628. At the time of the injury, the plaintiff was 19 years old, had not graduated from high school, had served two years in the military, and was working as an unskilled laborer for low hourly wages. *Id.* at 630. In the plaintiff's ensuing action for negligence and product liability, the trial court granted the defendant's motion to strike an economist's testimony regarding the plaintiff's loss of earning capacity. *Id.* at 631.

On appeal, the Supreme Court explained that testimony of an expert is admissible if it is helpful to the trier of fact; that testimony relating to the present value of lost earning capacity may be based on assumptions regarding future economic conditions, such as assumptions regarding inflation and future wage and interest rates; and that any weakness in such assumptions "can be explored by cross-examination or contrary evidence." *Id.* at 631. The court also explained that, where it is shown that there is "substantial similarity" of earning capacity between the plaintiff and other individuals in similar employment, testimony regarding the latter is admissible. *Id.* at 632 (citing *Plourd v. Southern Pac. Transp. Co.*, 272 Or 35, 40-42, 534 P2d 965 (1975)). The court emphasized that it "sp[oke] only of admissibility; of course the factfinder need not believe that a particular [individual's] experience would approximate the general norm." *Wilson*, 292 Or at 637. "The answer to the charge of speculativeness is that the factfinder must arrive at such a conclusion [regarding lost future earnings] with or without help[.]" *Id.*; *see also Conachan*, 266 Or at 64 (in a personal injury case, evidence required to support a claim for impaired earning capacity need not be "capable of exact monetary computation"; any evidence that "indicate[s] fairly the capacity of the plaintiff to earn money in his usual vocation should be admitted") (internal quotation marks omitted).

In this case, Haynes testified that, in calculating the present value of a person's lost future earnings, he considers an individual's age, occupation, and skills, as well as applicable wage and income growth rates, discount rates, and

other economic factors. He testified that the resulting projection of lost earning capacity for a particular individual can be made "with reasonable economic certainty." He also testified that, in this case, he assumed that Schoggins, who at the time of trial would have been 42 years old, would have worked for 23 additional years—that is, to age 65. He also assumed that, based on inflation and increasing productivity over time, the growth rate of Schoggins's wages over the 23-year time period would have been five percent per year. Haynes further assumed a discount rate of seven percent based on United States Treasury bond rates and, based on "many, many studies," a personal consumption rate—that is, a rate of spending on personal nondurable goods such as food and clothing—of 30 percent. Based on the seasonal nature of the type of outdoor construction work performed by Schoggins, Haynes estimated that Schoggins would work eight months a year.

Haynes applied those assumptions to two alternative projected base incomes. First, based on an hourly wage of $15 an hour for eight months a year, he projected a total yearly income of $19,000. Alternatively, based on an hourly wage of $25 an hour for eight months a year, he projected a total yearly income of $30,000 per year. Haynes testified that construction workers in Oregon make about $31,000 per year and that he was "very confident" that his projections regarding Schoggins's income were "pretty close." He also testified that, depending on whether Schoggins had any business expenses—such as expenses for tools—his gross pay might or might not differ from his net pay. Haynes testified that, applying the described discount rate, consumption rate, and other factors to an estimated $19,000 per year base income, the present value of Schoggins's estate was $240,000. Applying those factors to an estimated $30,000 per year of base income, the present value of his estate was $374,000.

On cross-examination, Haynes acknowledged that he had not seen any records of bank accounts or any other assets that substantiated Schoggins's projected income. Haynes also acknowledged that Schoggins had not filed any income tax returns during the 1990s, but he did not agree that that fact necessarily suggested that Schoggins's income

was so low that he was not required to file tax returns; he did not believe that there was any correlation between the failure to file returns and a person's income level. He also acknowledged that factors outside his area of expertise—including physical health—could affect Schoggins's earning capacity. Haynes explained that he does not account for tax liability in calculating a decedent's projected income because, if a plaintiff recovers an award of damages, taxes are imposed on that award.

We conclude that Haynes's testimony met the standard applicable to evidence of economic damages. Specifically, in this wrongful death action, Haynes's testimony was admissible to show plaintiff's damages arising out of pecuniary losses to Schoggins's estate and to his beneficiaries. Conversely, plaintiff's evidence of pecuniary damages was not insufficient as a matter of law by reason of the absence of particular forms of documentary evidence of Schoggins's prior earnings, such as income tax returns. Rather, those deficiencies went to the weight of Haynes's testimony.

For those reasons, the trial court did not err in denying Coleman's motion *in limine* to exclude evidence of specified sources of plaintiff's economic damages on the ground that there was no documentary evidence of Schoggins's past income. For the same reasons, the trial court also did not err in overruling Coleman's foundational objections to Haynes's testimony. Finally, viewing Haynes's testimony, including reasonable inferences, in the light most favorable to plaintiff, the nonmoving party, we cannot say that there is no evidence from which the jury could have awarded economic damages to plaintiff based on pecuniary losses to Schoggins's estate and to his beneficiaries; accordingly, the trial court did not err in denying Coleman's motion for a directed verdict on plaintiff's claim for economic damages. Coleman's fifth, sixth, and ninth assignments of error fail.

Affirmed.